Robert H. LUCAS
v.
"BRINKNES" SCHIFFAHRTS GES.

FRANZ LANGE G. m. B. H. & Co., K. G.
v.
NORTHERN METAL CO.

Dennis A. FARRO
v.
ETERNITY CARRIERS, INC.
v.
NORTHERN METAL CO.

Civ. A. Nos. 73–1120, 73–2150.

United States District Court,
E. D. Pennsylvania.

Aug. 5, 1974.

Milton M. Borowsky, Philadelphia, Pa. (73–1120), Arnold C. Grossman, Philadelphia, Pa. (73–2150), for plaintiffs.

E. Alfred Smith, Carl A. Putz, Phildelphia, Pa. (73–1120), H. Wallace Roberts, Philadelphia, Pa. (73–2150), for defendants.

James B. Doak, Philadelphia, Pa., for 3rd party def. in both cases.

William G. Downey, Philadelphia, Pa., filed amicus curiae brief on behalf of

Moore-McCormack Lines, Inc. and Companhia De Navegaco Maritima Netumar seeking denial of motion to dismiss 3rd party complaint.

Before LORD, Chief Judge, and LUONGO and HUYETT, District Judges.[*]

### OPINION

HUYETT, District Judge.

Congress in 1972 gave careful consideration to the compensation scheme provided by the Longshoremen's and Harbor Workers' Compensation Act of 1927, 33 U.S.C. § 901 et seq. (1970). Among the matters extensively treated in the 1972 Amendments to the Act, 33 U.S.C. § 901 et seq. as amended (Supp. II 1972), was the question whether third-party suits should be allowed by the longshoreman against the vessel which caused the longshoreman to be injured. Congress did provide for such suits when the vessel's negligence caused the injuries. 33 U.S.C. § 905(b) (Supp. II 1972). The cases before us present the question whether any recovery obtained by the longshoreman as a result of the vessel's negligence should either be diminished or be allowed against the longshoreman's employer—the stevedore—when its negligence is a concurrent cause of the injuries.

In each case a longshoreman seeks to recover damages against the defendant vessel owner as a result of injuries caused while working on the vessel.[1] The basis for recovery is alleged to be that the vessel owner was negligent. The vessel owners have filed third-party complaints against the longshoremen's employers alleging that the third-party defendant stevedores were negligent in causing injury to plaintiffs and failed in their contractual duty to perform their services in a competent and workmanlike manner causing injury to plaintiffs. In the alternative it is alleged that if the acts or omissions of the third-party defendants contributed to plaintiffs' injuries, the vessel owners are entitled to a credit or reduction of 50% of any damages awarded to plaintiffs.[2]

The second amended third-party complaints seek (1) full or partial indemnity from third-party defendants for some or all of the damages which may be awarded to the plaintiffs in the proceedings, as well as all legal fees, costs and expenses incurred and expended by defendants and third-party plaintiffs, (2) a credit or reduction of 50% of any and all damages adjudged and awarded to the plaintiffs in these proceedings, (3) contribution from third-party defendants for a proportionate share of any amount of damages adjudged and awarded to plaintiffs in these proceedings, or (4) contribution or indemnity from third-party defendants to the extent of all medical expenses and compensation paid or payable pursuant to third-party defendants' legal liability therefor under the terms and provisions of the Longshoremen's and Harbor Workers' Compensation Act, said amount to be applied as a credit or set off against whatever damages are awarded to plaintiffs in these proceedings.

The third-party defendant stevedores have moved to dismiss the second amended third-party complaints for failure to state claims upon which relief can be granted. And the plaintiff in Lucas has moved to strike the vessel's answer setting forth a 50% credit as a defense if the stevedore's negligence also caused

---

[*] A panel of three District Court judges was convened by Chief Judge Lord to consider these cases because of the number of cases pending in the Eastern District of Pennsylvania which have issues identical to the issues raised in these cases. This procedure will provide for uniformity of treatment of the issues involved even though a single district judge is not actually bound by our ruling in these cases. *See* Turner v. Transportacion Maritima Mexicana S. A., 44 F.R.D. 412, 414 n. 1 (E.D.Pa.1968).

1. Jurisdiction is premised on diversity of citizenship. 28 U.S.C. § 1332 (1970).

2. The proposition that third-party plaintiffs are entitled to a credit against any recovery obtained by the plaintiffs is also raised in the answer to the complaints. In *Lucas* the plaintiff has moved to strike this defense.

plaintiff's injuries. We will grant these motions.

## DEVELOPMENT OF THE THIRD-PARTY SUIT [3]

Longshoremen's remedies historically have been subject to the crosswinds sweeping o'er land and sea. Although employed by the land-based stevedore, the longshoreman typically performs his services on the vessel while it is in navigable waters. Atlantic Transport Co. v. Imbrovek, 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914), held that admiralty has jurisdiction over a suit by a longshoreman against his employer for injuries occurring on the vessel while it is in navigable waters. With respect to the maritime nature of the longshoreman's work the Court stated: "Formerly the work was done by the ship's crew; but, owing to the exigencies of increasing commerce and the demand for rapidity and special skill, it has become a specialized service devolving upon a class 'as clearly identified with maritime affairs as the mariners.'" Atlantic Transport Co. v. Imbrovek, 234 U.S. *supra* at 62, 34 S.Ct. at 735. The theme that work performed on the vessel afforded longshoremen the benefit of admiralty remedies has been the source of much of the conflict Congress sought to resolve in the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act.

## A. ENACTMENT OF A WORKMEN'S COMPENSATION SCHEME

Tension between the two great bodies of law governing affairs of the sea and of the land began when the Court in Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), asserted that a state compensation scheme providing benefits for a longshoreman injured on navigable waters was incompatible with the need for uniformity in maritime law. In rapid succession the Court struck down two further attempts by Congress to bring longshoremen within the ambit of state compensation acts. Knickerbocker Ice Co v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920), held unconstitutional an amendment to the "saving to suitors clause" [4] allowing application of state compensation laws to injuries occurring on the vessel. Washington v. Dawson & Co., 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924), invalidated a statutory amendment similar to that involved in Stewart.

True to its reasoning in Imbrovek the Court then held that longshoremen were seamen within the meaning of the Jones Act, 46 U.S.C. § 688, and could, therefore, recover under that Act against the stevedore-employer for the latter's negligence. International Stevedoring Company v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157 (1926). The Jones Act provided the longshoreman with an attractive negligence remedy against his employer. The Jones Act plaintiff was not subject to the assumption of risk or contributory negligence defenses. This situation was altered, however. when Congress enacted the Longshoremen's and Harbor Workers' Compensation Act making the longshoreman's remedy under the Act the exclusive method of relief against the employer.[5] *See* Swanson v. Marra Brothers, Inc., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1946) (holding that the Harbor Workers' Act provided the exclusive remedy by the longshoreman against his employer and that he could not sue under the Jones Act).

---

3. *See generally* Note, Maritime Jurisdiction and Longshoremen's Remedies, 1973 Wash. Univ.L.Q. 649; F. Tetreault, Seamen, Seaworthiness, And The Rights of Harbor Workers, 39 Cornell L.Q. 381 (1954); G. Gilmore and C. Black, Admiralty, 248–394 (1957).

4. Codified at 28 U.S.C. § 1333 (1970).

5. A twilight zone of coverage by state compensation acts was allowed in certain circumstances. 33 U.S.C. § 903(a) (1970); Rodes, Workmen's Compensation for Maritime Employers: Obscurity in the Twilight Zone, 68 Harv.L.Rev. 637 (1955). Section 2(c) of the 1972 Amendments eliminates this twilight zone. 33 U.S.C. § 903(a) (1972 Supp. II).

Liability of the employer under the Act likewise was to be "exclusive and in place of all other liability of such employer to his employee, his legal representative, husband or wife, parents, defendants, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death * * * ." § 5, 44 Stat. 1426, as amended, 33 U.S.C. § 905 (1970). The Act permitted the longshoreman, however, to bring an action against any third party who may have caused the injuries. § 33, 44 Stat. 1440, as amended, 33 U.S.C. § 933 (1970). The admiralty remedy of unseaworthiness became the predominant relief sought in these third-party actions.

## B. THE DOCTRINE OF UNSEAWORTHINESS

Historically, the vessel's duty to provide a seaworthy ship was available only to the seaman and then only in limited circumstances. The seaman could not recover for the operating negligence of the master in giving an order which caused the seaman injury. The OSCEOLA, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903).[6] Furthermore, "[t]he shipowner's liability in American Courts, as in the English, was limited to cases in which he had failed to use reasonable care to provide proper appliances, and liability did not attach where mariners' injuries resulted from the failure of those aboard the vessel to make proper use of such appliances." F. Tetreault, Seamen, Seaworthiness, and the Right of Harbor Workers, 39 Cornell L.Q. 381, 392 (1954) (footnote omitted).

Later cases, however, have established the doctrine of seaworthiness of the vessel as an absolute non-delegable duty without regard to negligence owed to the seaman, the longshoreman and other harbor workers injured on the vessel. Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), established the warranty of seaworthiness to be absolute. Harking back to the maritime nature of the longshoremen's work articulated in Imbrovek, supra, the Court in Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), held that the warranty of seaworthiness was available to the longshoreman. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L. Ed. 143 (1953), extended the warranty of seaworthiness to other harbor workers injured on the vessel. The warranty was also available to the harbor worker even though he was directly employed by the vessel. Reed v. Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963).

The scope of the liability imposed on the vessel by the doctrine of seaworthiness was broad. As stated by one commentator:

"Since *Mahnich*, courts have found liability under the warranty of seaworthiness for such conditions as defects in cargo containers,[33] improper stowage of cargo,[34] the presence of extraordinarily hostile or aggressive seamen,[35] the requiring of two men to do the work of four,[36] faulty ship's structure [37] and equipment,[38] defective equipment brought aboard by the stevedore,[39] and incompetent personnel.[40]

"[33] Gutierrez v. Waterman S.S. Corp., 373 U.S. 206 [83 S.Ct. 1185, 10 L.Ed.2d 297] (1963); Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355 [82 S.Ct. 780, 7 L.Ed.2d 798] (1962).

"[34] Gindville v. American-Hawaiian S.S. Co., 224 F.2d 746 (3d Cir. 1955); Amador v. A/S J. Ludwig Mowinckels Rederi, 224 F.2d 437 (2d Cir.), cert. denied, 350 U.S. 901 [76 S.Ct. 179, 100 L.Ed. 791] (1955); Palazzolo v. Pan-Atlantic S.S. Corp., 211 F.2d 277 (2d Cir. 1954) aff'd sub nom. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124 [76 S.Ct. 232, 100 L.Ed. 133] (1956).

"[35] Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336 [75 S.Ct. 382, 99 L.Ed. 354] (1955).

"[36] Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724 [87 S.Ct. 1410, 18 L.Ed. 2d 482] (1967).

"[37] Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423 [79 S.Ct. 445, 3 L.Ed.2d 413] (1959).

---

6. The Jones Act, 46 U.S.C. § 638, later provided a remedy for this kind of negligence.

"[38] Seas Shipping Co. v. Sieracki, 328 U.S. 85 [66 S.Ct. 872, 90 L.Ed. 1099] (1946).

"[39] Alaska S.S. Co. v. Petterson, 347 U.S. 396 [74 S.Ct. 601, 98 L.Ed. 798] (1954), aff'g per curiam 205 F.2d 478 (9th Cir. 1953). The Ninth Circuit had 'assumed' that the equipment causing the longshoreman's injury had been brought aboard by the stevedore contractor, had said that no proof existed that the equipment was defective, had conceded that the stevedore had control of the ship at the time of the injury, and then had held that the shipowner's duty is 'one he cannot delegate.' 205 F.2d at 480.

"[40] Keen v. Overseas Tankship Corp., 194 F.2d 515 (2d Cir. 1952)."

Maritime Jurisdiction and Longshoremen's Remedies, 1973 Wash.U.L.Q. 649, 655. In addition, the vessel has been held liable when the primary cause of the longshoreman's injury was brought into play by his fellow workers. Crumady v. The JOACHIM HENDRIK FISSER, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Albanese v. Matts, 382 U.S. 283, 86 S.Ct. 429, 15 L.Ed.2d 327 (1965); Blassingill v. Watermann S.S. Corp., 336 F.2d 367 (9th Cir. 1964).

## C. INDEMNITY ACTION BETWEEN SHIPOWNER AND STEVEDORE

The liability imposed on the vessel by the warranty of seaworthiness soon washed ashore engulfing the land-based stevedore in indemnity actions whenever the stevedore's actions caused the unseaworthy condition. Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Co., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), held that an action by the vessel against the stevedore based on an implied contract to perform his duties in a workmanlike manner was not barred by the exclusivity provision of section 5 of the Longshoremen's and Harbor Workers' Compensation Act. 33 U.S.C. § 905 (1970).

In regard to the exclusivity provision the Court reasoned that section 5 evidenced a trade-off between the employer and the employee. The employee obtained compensation regardless of fault and the employer was free from any other liability to the employee. "On the other hand, the Act prescribes no quid pro quo for a shipowner that is compelled to pay a judgment obtained against it for the full amount of a longshoreman's damages." 350 U.S. *supra* at 129, 76 S.Ct. at 235 (footnote omitted). Furthermore, "[t]he Act nowhere expressly excludes or limits a shipowner's right, as a third person, to insure itself against such a liability either by a bond of indemnity, or the contractor's own agreement to save the shipowner harmless." 350 U.S. *supra* at 130, 76 S.Ct. at 235. The Act, therefore, did not preclude relief against the stevedore.

The Sieracki-Ryan line of cases thus resulted in the stevedore often being held liable to his employee far beyond his compensation obligations under the Act.

## RIGHT TO CONTRIBUTION IN ADMIRALTY [7]

The Ryan court was precluded by Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), from holding that the vessel had a right of contribution against the stevedore when the stevedore was also a cause of the longshoreman's injury. Halcyon refused to permit contribution against the stevedore even though there was a jury determination that the stevedore was 75% responsible for the longshoreman's injuries. While raising doubts about the existence of the right to contribution in a non-collision admiralty case, the Court based its refusal to provide for contribution upon the inappropriateness of the judiciary in fashioning rules of contribution. The Court felt the matter should be left to Congress.

Recently, in Cooper Stevedoring Co. Inc. v. Kopke, 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974), the Court resolved any doubt about the existence

7. *See generally* C. Staring, Contribution and Division of Damages in Admiralty and Maritime Cases, 45 Cal.L.Rev. 304 (1957).

of a right to contribution among joint tortfeasors in a non-collision admiralty action.[8] The Court stated:

"Indeed, it is fair to say that application of the rule of division of damages between joint tortfeasors in admiralty cases has been as broad as its underlying rationales. The interests of safety dictate that where two parties 'are both in fault, they should bear the damage equally, to make them more careful.' *The Alabama, supra,* 92 U.S. 695 at 697, 23 L.Ed. 763. And a 'more equal distribution of justice' can best be achieved by ameliorating the common-law rule against contribution which permits a plaintiff to force one of two wrongdoers to bear the entire loss, though the other may have been equally or more to blame. See *The Max Morris, supra,* 137 U.S. 1 at 14, 11 S.Ct. 29, 34 L.Ed. 586."

Cooper Stevedoring Co. v. Kopke, 417 U.S. 106, at 110, 94 S.Ct. at 2177.

With respect to the specific issue raised in Halcyon, the Cooper court agreed with lower federal courts that Halcyon provided only an immunity for the employer from tort liability by statute. *See* In re Seaboard Shipping Corp., 449 F.2d 132 (2d Cir. 1971), cert. denied Seaboard Shipping Corp. v. Moran Inland Waterways Corp., 406 U.S. 949, 92 S.Ct. 2038, 32 L.Ed.2d 337 (1972); Watz v. Zapata Off-Shore Corp., 431 F.2d 100 (5th Cir. 1970); Horton & Horton, Inc. v. T.S.J.E. Dyer, 428 F.2d 1131 (5th Cir. 1970), cert. denied, 400 U.S. 993, 91 S.Ct. 461, 27 L.Ed.2d 441 (1971). Referring to Halcyon the Court stated:

"Before this Court, both parties in *Halcyon* agreed that 'limiting an employer's liability for contribution to those uncertain amounts recoverable under the Harbor Workers' Act is impractical and undesirable.' 342 U.S., at 284, 72 S.Ct. 277. The Court also took cognizance of the apparent trade-off in the Act between the employer's limitation of liability and the abrogation, in favor of the employee, of common-law doctrines of contributory negligence and assumption of risk. *Id.,* at 285–286, 72 S.Ct. 277. Confronted with the possibility that any workable rule of contribution might be inconsistent with the balance struck by Congress in the Harbor Workers' Act between the interests of carriers, employers, employees, and their respective insurers, we refrained from allowing contribution in the circumstances of that case."

Cooper Stevedoring Co., Inc. v. Kopke, 417 U.S. *supra* at ——, 94 S.Ct. at 2178. It is therefore clear that, absent considerations imposed by statutes such as the Longshoremen's and Harbor Workers' Compensation Act, admiralty courts are relatively free to fashion appropriate rules of contribution based on fairness to the parties.

A rule of contribution never applied in an admiralty case finds support in cases from the District of Columbia Circuit Court of Appeals. Murray v. United States, 132 U.S.App.D.C. 91, 405 F.2d 1361 (1968), held that the lessor of a building leased to the United States was entitled to a *pro rata* credit on any liability obtained against it by a government employee if the government's negligence also caused the employee to be injured. The government enjoyed immunity from tort liability to its employees as a result of the exclusivity provision of the Federal Employees Compensation Act, 5 U.S.C. § 8116(c) (1970). The Murray court found support for such a credit in cases involving the effect of a release by the plaintiff of a joint tortfeasor. *See* Martello v. Hawley, 112 U.S.App.D.C. 129, 300 F.2d 721 (1962); McKenna v. Austin, 77 U.S. App.D.C. 228, 134 F.2d 659 (1943). No analysis was made by the Murray court of the different considerations involved in a statutorily created immunity from those involved in a contractual settlement of liability.

8. *Cooper* was a pre-1972 Amendment case and thus did not consider the issue before us.

Dawson v. Contractors Transport Corp., 151 U.S.App.D.C. 401, 467 F.2d 727 (1972), affirmed the propriety of the Murray credit and noted the doctrine's basis in equity. Significantly, the Dawson court dealt with a private District of Columbia employer who enjoyed the benefit of the exclusivity provision of the Longshoremen's and Harbor Workers' Compensation Act.[9]

## THE 1972 AMENDMENTS TO THE LONGSHOREMEN'S AND HARBOR WORKERS' COMPENSATION ACT OF 1927

The 1972 Amendments to the Act dealt with four considerations: (1) the level of benefits provided, (2) the extension of the Act's coverage to additional workers, (3) the provision for third-party suits against persons other than the employer, and (4) administrative matters. Increasing benefits under the Act was closely tied to a resolution of the issue whether third-party suits resulting in liability to the stevedore beyond that provided in the Act should be allowed.

The cause of this increased liability of the stevedore to his employee was primarily attributed to the expansive scope given the doctrine of seaworthiness in Mahnich, the application of the doctrine to persons covered by the Longshoremen's and Harbor Workers' Compensation Act in Sieracki with the resultant liability imposed on the stevedore by Ryan. The Committee Reports reflect the concern for this increased liability. The Senate Report states:

"While everyone has agreed since at least the mid-1960's that the benefits under this Act should be raised, there has been some dispute over the years as to whether such benefits should be raised so long as this compensation law was not the exclusive remedy for an injured worker. It has been the feeling of most employers that while they were willing to guarantee payment to an injured worker regardless of fault, they would only do so if the

right to such payment was the exclusive remedy and they would not be subject to additional law suits because of that injury."

S.Rep. No. 92–1125, 92d Cong. 2d Sess., 4–5 (1972). See also H.R.Rep. No. 92–1441, 92d Cong., 2d Sess., 4–8 (1972), U.S.Code Cong. & Admin.News, p. 4698.

There can be no doubt that Congress achieved its purpose of eliminating increased liability to the employer due to the seaworthiness doctrine. Congress amended the exclusivity section of the Act by adding subsection 5(b), 33 U.S.C. § 905(b), which provides as follows:

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title *and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.* If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was cause by the negligence of persons engaged in providing ship building or repair services to the vessel. *The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred.* The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.[10] (Emphasis added.)

---

9. 36 D.C.Code § 501 makes applicable to the District of Columbia the Longshoremen's and Harbor Workers' Compensation Act.

10. Subsection 5(a), 33 U.S.C. § 905(a), provides as follows:
"The liability of an employer prescribed in section 904 of this title shall be exclu-

The amendment eliminates suits against the vessel based on the doctrine of seaworthiness by persons covered under the Act. In addition, agreements to indemnify or hold harmless the vessel are expressly prohibited. Furthermore, the Yaka case, allowing suit by the longshoreman when directly employed by the vessel, is overruled by providing that the vessel in that circumstance is entitled to the same exclusive liability as the stevedore is to his employees.

Essentially Congress rejected the courts' rationale that the longshoreman's tasks were subject to similar conditions and hazards as those of seamen. The House Report states:

"... [T]he Committee has noted that the seaworthiness concept was developed by the courts to protect seamen from the extreme hazards incident to their employment which frequently requires long sea voyages and duties of obedience to orders not generally required of other workers. The rationale which justifies holding the vessel absolutely liable to seamen if the vessel is unseaworthy does not apply with equal force to longshoremen and other non-seamen working on board a vessel while it is in port."

H.R.Rep. No. 92–1441, 92d Cong., 2d Sess. 6 (1972), U.S.Code Cong. & Admin.News, p. 4703.

Congress did, however, provide for suit by the longshoreman against the vessel for injuries caused by the vessel's negligence. The third-party plaintiff vessel owners argue that upon a showing of concurrent negligence by the stevedore causing injuring to the longshoreman, they are entitled to a Murray credit or a *pro tanto* release of liability to the extent of any payments made by the stevedore to the longshoreman under the Act. Under the latter theory liability would be measured not by injury to the longshoreman but only by the amount of compensation paid by the stevedore. In addition, they claim a right to recover counsel fees and expenses upon a showing that the stevedore's negligence was the sole cause of the injuries to the longshoreman. The *amicus curiae* brief argues that the vessel can be liable only if it was the sole cause of the longshoreman's injuries, or, in the alternative, the vessel can only be liable to the proportionate extent it caused the longshoreman's injuries. Under the latter theory the longshoreman's recovery would first be reduced by the longshoreman's own negligence and then by the extent to which the stevedore's negligence caused the injuries.

As is evident from these arguments, there are numerous solutions possible in determining how to spread liability among joint tortfeasors with each solution having the common denominator, so it is contended, of fairness.[11] Regardless of what our feelings may be, however, we are bound in the cases before us by Congress' policy determination.

Although Congress' attention was primarily focused on eliminating the liability thrust upon the stevedore by the Mahnich-Sieracki-Ryan line of cases, it appears clear to us that this concern was

---

sive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under the chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death. In such action the defendant may not plead as a defense that the injury was caused by the negligence of a fellow servant, or that the employee assumed the risk of his employment, or that the injury was due to the contributory negligence of the employee."

11. It is clear from the Committee Hearings that Congress was aware of the possibility of such a *pro tanto* shifting of liability. *See* H.R. Hearings, Statement of David Kaplan, Esq. and comments by John R. Martzell, Esq. at pp. 152–53.

merely part of a larger effort to insulate the longshoreman's and harbor worker's employer from any liability other than that provided by the Act. Third-party suits were considered disruptive of the compensation scheme provided by the Act. Congress was concerned with the cost involved in allowing third-party suits. The expense to the stevedore involved in defending these suits was seen as a drain on the funds available for compensation under the Act.

It was understood by the members of Congress most directly involved in amending the Act that in allowing for any third-party suits Congress ran the risk that liability would eventually be visited on the employer. It was deemed essential that clear amending language be used to prevent such an occurrence. The process by which a consensus was reached to allow for a third-party suit against the vessel for its negligence illustrates ·Congress' paramount concern that the employer's liability under the Act to his employee must be insulated and was intended to be insulated by the emphatic language of amended subsection 5(b), 33 U.S.C. § 905(b).

In addition to the bills introduced in each house of Congress designed to increase compensation benefits and for other purposes, H.R. 3505 and S. 525 sought specifically to deal with third-party suits. Both these bills had the support of the shipowner and stevedore industry. Both proposed to eliminate completely third-party suits against the vessel. They would accomplish this result by defining the vessel as the longshoreman's employer even though the longshoreman may not have been directly employed by the vessel when injured. Labor interests, while desirous of effecting a raise in compensation benefits, were opposed to a complete elimination of third-party suits.

Allowance of a suit for negligence was seen as a practical compromise which would lessen the industry's opposition to increased benefits and still provide some remedy against the vessel when it was at fault in causing the longshoreman's injuries. In providing for the third-party suit against the vessel for its negligence, Congress perceived that it was eliminating the large number of cases in which the vessel was held liable without fault pursuant to the doctrine of seaworthiness. This perception was based on the assumption that the negligence remedy provided would be similar to the common law concept based on fault and not any maritime negligence concept in which the vessel owed some special duty to provide the longshoreman a safe place to work. Narrowing the scope of the vessel's duty with regard to safety to that of a common law fault duty was designed to eliminate as much as possible the unfairness to the vessel caused by the seaworthiness doctrine while still providing some remedy for the vessel's actions in causing the longshoreman to be injured. At the same time, however, Congress expressed its concern that the stevedore employer would not be held liable for any damages caused by the vessel owner's negligence.

This overriding concern to insulate the employer was clearly presented in both the House and Senate hearings held on the various bills introduced. The testimony given by Francis A. Scanlan, Esquire in both houses of Congress presented most sharply the limits of the compromise solution allowing for a common law negligence suit against the vessel with insulation from liability to the employer-stevedore. Mr. Scanlan testified in favor of the bills eliminating the third-party actions. But in response to subcommittee members' questions concerning a common law negligence suit against the vessel, he indicated approval of such an approach so long as the liability was based on the vessel's fault and the stevedore would be insulated from liability. There appeared to be a consensus among the subcommittee members to such an approach.

The discussions in the Senate hearings illustrate Congress' objective of narrowing the liability of the shipowner to situations involving fault while insulating the stevedore from liability. Senator

Eagleton, the Chairman of the Subcommittee on Labor of the Committee on Labor and Public Welfare, questioned Mr. Scanlan about the nature of the maritime liability owed by the shipowner. Mr. Scanlan pointed out that the seaworthiness doctrine imposed absolute liability on the vessel and that maritime negligence also imposed broad duties on the vessel unlike the relatively narrow duty imposed by common law negligence. Minority counsel, Mr. Mittelman, questioned whether the elimination of the seaworthiness doctrine would end the absolute duty imposed on the vessel. Mr. Scanlan thought such action would eliminate absolute liability but that the maritime negligence duty would still be broad and might by case law development approach an absolute duty. It was then suggested by Senator Eagleton and Mr. Mittelman that the concern over maritime negligence could be alleviated if Congress expressed its intention that the vessel's duty would be analogous to a common law negligence duty and that a provision prohibiting indemnity agreements would insure that the liability imposed on the vessel by a common law negligence duty would not be shifted to the stevedore. All agreed that this result should and could be obtained. *See* Senate Hearings, Subcommittee on Labor of the Committee on Labor and Public Welfare, 92d Cong., 2d Sess. at 270–74 (1972) (see Appendix to this opinion). A similar discussion appears in the House Committee Hearings. *See* H. R. Hearings, Select Subcommittee on Labor of the Committee on Education and Labor, 92d Cong., 2d Sess. at 117–21 (1972).

■ More important, however, the language of amended subsection 5(b) tracks such a consensus understanding. The subsection explicitly eliminates the seaworthiness remedy. If Congress had intended only to overrule Sieracki and Ryan and to eliminate the stevedore's liability for unseaworthiness, it could have done so simply by eliminating seaworthiness claims against the vessel. But Congress did more. It specifically provided that the employer could not be held liable to the vessel by means of indemnity or hold harmless agreements. These prohibitions could only relate to attempts by the vessel to shift its negligence liability to the employer, for it is only for negligence that the vessel can be held liable. Furthermore, it would be anomalous for a court to provide that the stevedore must bear all or part of the vessel's liability when, under the statute, the parties cannot, by agreement, shift the liability. We think it clear, therefore, that Congress intended to insulate the employer from any liability, including costs and counsel fees, to the vessel for the vessel's negligence.

■■ We cannot at this time fashion the outlines of the negligence remedy Congress allowed to be brought against the vessel. This can only be left to future case development. It is clear, however, that Congress decided that the primary duty to provide a safe place to work is on the stevedore. The substantial increase in compensation benefits provided by the amendments was thought to be an incentive to the stevedore to provide a safe place to work. As stated in the Senate Report:

"It is important to note that adequate workmen's compensation benefits are not only essential to meeting the needs of the injured employee and his family, but, by assuring that the employer bears the cost of unsafe conditions, serve to strengthen the employer's incentive to provide the fullest measure of on-the-job safety.

"This consideration is particularly crucial with respect to high-risk occupations such as those covered by this Act. Longshoring, for example, has an injury frequency rate which is well over four times the average for manufacturing operations. It is the Committee's view that every appropriate means be applied toward improving the tragic and intolerable conditions which take such a heavy toll upon workers' lives and bodies in this industry, and such means clearly include vigorous enforcement of the Maritime

Safety Amendments of 1958 and the Occupational Safety and Health Act of 1970, as well as a workmen's compensation system which maximizes industry's motivation to bring about such an improvement."

Senate Report No. 92–1125, 92d Cong., 2d Sess., 2 (1972). Courts should recognize that this duty falls primarily on the stevedore and not on the vessel owner. At the same time, however, Congress was concerned that the vessel owner not become lax in doing what it should reasonably be required to do to prevent injuries to the longshoremen. The common law negligence remedy was thought sufficient to provide the vessel with the necessary incentive. The argument by the *amicus curiae* that the shipowner can be liable only when it is solely negligent would negate Congress' intention to prevent shipowner negligence and is contrary to the terms of the Act. The Act clearly provides for such a suit regardless of the concurrent negligence by the stevedore. If Congress intended that the vessel could be liable only when its negligence was the sole cause of the injuries, the mere insertion of the word "solely" in the first sentence of subsection 5(b), 33 U.S.C. § 905(b) would have accomplished the result.

While leaving to future development the nature of the negligence action against the vessel, we consider it clear that with respect to the stevedore the sole liability was that provided under the Act. Congress sought to eliminate all actions against the stevedore whether for indemnity or contribution, whether based on tort or on contract, and whether for fees and expenses. Allowance of any such actions, even a *pro tanto* recovery to the extent of payments made by the employer under the Act, would create the circuitous type action Congress considered was too costly and disruptive of the compensation scheme to be permitted.

This result may leave the shipowner in an unenviable position. Certainly he is apprehensive about future case development which may lead to an expansive interpretation of the negligence action provided under the Act. If that result obtains, Congress would undoubtedly be called upon to act. In the meantime, however, our feelings of fairness to the shipowner cannot override Congress' intention. With respect to the negligence action against the vessel, courts have been thrust back to the situation existing before the expansive development of the seaworthiness doctrine. That situation was posed by one commentator as follows:

"The seemingly limitless controversy and complexity that attends personal injury litigation between harbor workers and shipowners is attributable in part to a difficulty in resolving the respective scopes of the shipowner's obligation in connection with the condition of the vessel to the longshoreman as a 'business invitee', and the obligation of the independent stevedore contractor as employer of the longshoreman to exercise due diligence to furnish his employee a 'safe place to work'."

Tetreault, 39 Cornell L.Q. *supra* at 409. Courts must now work to resolve this difficulty.

The various methods proposed by the vessel owners to shift their tort liability would cause a disruption in the scheme provided by Congress. To this extent the wisdom of the Halcyon case endures. It is for Congress to provide the proper balance. Courts' sense of fairness can only prove disruptive of that balance.

APPENDIX TO OPINION

SENATE HEARINGS, SUBCOMMITTEE ON LABOR AND PUBLIC WELFARE, 92d CONG., 2d SESS. AT 270–74 (1972)

Senator Eagleton. Is there any other field—any employer-employee law with respect to a third-party situation where there is absolute liability imposed?

Mr. Scanlan. Not to my knowledge, Mr. Chairman.

Senator Eagleton. In the standard workmen's compensation situation, say

in manufacturing plants that are assembling things, and the worker gets his hand cut in a mechanical device—

Mr. Scanlan. A wheel or something like that?

Senator Eagleton. A wheel; yes.

And he loses a finger or a hand. He has certain workmen's compensation rights that are afforded to him under State law, and if there was a third-party intervention in the situation say, in the manufacturing of the device by the X manufacturing company, he could bring, in essence, a product liability claim for negligence against that third-party; is that the standard sort of hornbook law?

Mr. Scanlan. Yes; that is, Mr. Chairman.

Senator Eagleton. Your objection is to the absolute liability?

Mr. Scanlan. We are objecting to that, Mr. Chairman, because it is absolute liability, and also because the courts have construed negligence—maritime negligence in such a way that it is almost impossible to distinguish the case that you have given to me, which is a classic case of common law, negligence, as compared with maritime negligence—the duty to provide a safe place to work, as a form of negligence.

But it is also a form of absolute liability. And this is separate and apart from the question of the unseaworthiness of the gear, the appurtenances and equipment. This is what makes this particular problem so unique and so novel. And this is the reason why, Mr. Chairman, we feel that the cases should be eliminated as set forth in the bill, S. 525. This would then cure the situation of the unseaworthiness and the negligence and it would give the longshoremen the right to bring in true third-party cases against any party who is not a party to the employment relationship.

For example, in the case you have just cited, Mr. Chairman, under our proposal and the proposals set forth in S. 525, if the longshoremen want to sue the manufacturer of a piece of equipment, as you have just stated, a winch, for example, or any part of the equipment on board the vessel, that manufacturer could be sued the same as in a typical compensation case. What we feel should be done is that this particular field of the law should be restored to the regular compensation aspects and these cases that have distorted the law should be eliminated.

\* \* \* \* \* \*

I don't have the time now, but the real economic impact on the entire industry, the idea of eliminating these cases as I have just stated to you, to restore this act to a true compensation act, and I say to you, Mr. Chairman, in conclusion, that our committee is convinced that for the welfare of the entire maritime industry it is necessary to eliminate these cases.

We agree with the statement that was made by Secretary of Labor Hodgson, which I have referred to on the top of page 17 of my statement; we feel that if these cases are eliminated and this act is restored as a true compensation act, then there definitely should be an improvement in the benefits, . . .

However, if there isn't to be any elimination of the third-party liability, and if we are to be exposed to the cost that we are exposed to now, and then additional costs that are now evaluated for the proposed benefits, we could not agree to that because that would really be catastrophic as far as this industry is concerned.

\* \* \* \* \* \*

[minority counsel]

Mr. Mittelman. Do you know whether it is a common practice in the Port of Philadelphia and other ports for stevedores to include in their contracts, to include in their contracts with shipowners, a hold harmless clause under which the stevedore agrees to hold the shipowner harmless even from the results of the shipowner's own negligence if it causes an injury to one of the stevedore's employees?

Mr. Scanlan. Mr. Mittelman, I think there are some cases where that has happened, and it all depends on the contract and the contractual relationship between the parties, the shipowner, and the stevedore.

That's the typical hold harmless agreement.

I would say that there are some of those. I don't know how many. I know of one particular case that I had myself. They exist in other ports as well. I could not tell you, Mr. Mittelman, what the percentage is overall.

My own opinion is, based on cases that I have handled, that these are not too common, although they do exist.

Mr. Mittelman. If we wrote into this a prohibition, a hold harmless clause to the extent that they hold a shipowner harmless for injuries due to the shipowner's own negligence, plus a provision which authorized third-party actions only where there was negligence on the part of the shipowner as a third party, wouldn't that protect the stevedore from the circular liability that he now develops?

Mr. Scanlan. Yes; that would give him a good deal of protection. It wouldn't be complete protection, because of the fact that you have stated, that you would retain the right of the longshoremen to bring a suit against the shipowner for negligence.

Mr. Mittelman. But that's the shipowner's negligence. If he was negligent because he prohibited the hold harmless clause, he would not be able to go back against the stevedore.

Mr. Scanlan. Then you are saying basically that you would outlaw the indemnity action by the shipowner against the stevedore, which the Supreme Court came up with in the *Ryan* case.

In other words, you would say there could not be any indemnity between the shipowner and the stevedore. If there was shipowner's negligence and only shipowner negligence and it was not part of any unseaworthiness, it was not part of the duty to provide a safe place to work, then you would restrict, no

question, this would cut down on a very substantial part of the third-party cases, and wherever there was shipowner negligence, as you have described it, and this is something that we have to look into as far as language is concerned, wherever there was shipowner negligence, then the shipowner could not bring an action against the stevedore for indemnity. That would be different from telling the stevedore that he couldn't enter into a contract. It would be as a matter of law that there wouldn't be any indemnity between the shipowner and the stevedore.

Mr. Mittelman. There is a precedent for this. I think it is section 236 of the New York State real property law, which prohibits an owner of a building from getting a hold harmless because from, say, the maintenance contractor under which the maintenance contractor agrees to indemnify the owner of the building from the results of his own negligence. There is precedent for this sort of thing.

*What I am getting at is a system that permits the third-party action and then prohibits the shipowner from coming back against the stevedore.*

In the case where the stevedore was negligent, you wouldn't have any action against the shipowner because the stevedore's doctrine would be out.

Mr. Scanlan. Any negligence on the part of the stevedore there would be covered under the Compensation Act.

Senator Eagleton. Do I take it, so I understand his questions and your answers there, what he is postulating to you is, what I take it to be as garden variety typical workmen's compensation law; to wit, the employer provides for his immediate employee under workmen's compensation—whether negligence or not. And if there is third-party negligence, the employee proceeds against the third-party in a tort action.

Mr. Mittelman. That's correct.

Senator Eagleton. That is standard Missouri variety workmen's compensation.

What do you think of that insofar as longshoremen's work is concerned?

Mr. Scanlan. I think I have already told Mr. Mittelman that, first of all, we think to merely give the plaintiff protection, all third-party cases should be eliminated as in 525.

Senator Eagleton. Do you really want to eliminate them when the third party is actually negligent? Not made absolutely liable for any situation but actual negligence on the part of the third party?

Mr. Scanlan. We think, Mr. Chairman, that all cases against the shipowner, only against the shipowner, should be eliminated; and the reason for that is, *it is awfully difficult to try to limit negligence cases with respect to a shipowner where you have the maritime law such as it is.*

As far as the other type, the garden type variety—

Senator Eagleton. *Can we not legislate "new maritime law" in this situation?*

Mr. Scanlan. Yes; I think that's entirely possible.

Mr. Mittelman's suggestion certainly deserves consideration. I would like to . . . . see the language that Mr. Mittelman would suggest on that. *It is a matter of very careful draftsmanship to find the right language so that we don't find ourselves back with third-party cases all over again, not on the basis of unseaworthiness, but on the basis of maritime negligence, which some court is going to say is absolute liability, the same as unseaworthiness.* That's the problem, Mr. Chairman, that I am trying to direct my attention to.

Mr. Mittelman. The one point that I really was leading up to is that—you should treat this situation the same as a construction site where you have a number of different employees working on different contracts.

The typical situation—an employee of an electrical subcontractor is injured by a pipe dropped from three floors above by the employees of a plumbing subcontractor and then suing the plumbing subcontractor, if he can show negligence.

By the same token, except in a small minority of States, he does have the third-party action where he can establish negligence. I don't know that the maritime concept of negligence is very much different from the theory of negligence which is now applied by the courts on a construction site where you have hazardous activities as well. I don't see the problem would be any more formidable in drafting something to take care of that situation than they would in the construction industry.

Mr. Scanlan. I understand your point, Mr. Mittelman, and it is something that certainly deserves consideration.

Our view was, because of the peculiarities of maritime law, it would be better to eliminate all cases against shipowners and have the longshoremen given the right to sue anyone else except the shipowner. (Emphasis added.)