Edward J. RICH, Appellant,

v.

UNITED STATES LINES, INC.,
Appellee.

No. 78–1261.

United States Court of Appeals,
Third Circuit.

Argued Oct. 18, 1978.

Decided March 6, 1979.

Robert C. Daniels, Philip L. Blackman, Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., for appellant.

William E. Rapp, Timothy J. Abeel, Rawle & Henderson, Philadelphia, Pa., for appellee.

Before GARTH, BIGGS and MARIS, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

The present appeal arises under Section 18(a) of the Longshoremen's and Harbor Workers' Compensation Act, Amendments of 1972, 33 U.S.C. § 905(b) (1976), pursuant to which a longshoreman may bring a negligence action against a vessel owner upon whose ship he is injured.

The plaintiff-appellant, Rich, a longshoreman employed by J. A. McCarthy (McCarthy) in its stevedoring operations, was hurt while handling containerized cargo aboard the M/V American Alliance (Alliance), owned and operated by the defendant-appellee, United States Lines (Lines). Some of these containers were twenty feet long, others forty feet long, and they were all about eight to ten feet wide and about eight and one-half feet high. They were stored on the deck of the ship, stacked three high, and were fully exposed to weather conditions. Lashed down with wires running from the top of each container to the main deck of the vessel, they were further secured by a device known as a "pineapple," [1] which prevents stacked containers from sliding off of the lower containers. As part of the stevedore operation, the longshoremen had to be lifted up into the air by a crane and placed on top of the cargo. [2] They would then lash and unlash the containers as well as adjust the pineapples. It was during this operation, which took place at the Tioga Terminal in Philadelphia, Pennsylvania, that Rich was injured when he fell from the top of a container allegedly covered with ice. The Alliance was in navigable waters.

The Alliance left New York on February 6, 1973, at 8:12 p. m. While underway, the vessel encountered light rain and snow, although there is no indication in the record that the temperature was ever below freezing. Nevertheless, it seems clear that some ice had formed on the tops of the containers by the time the longshoremen began to work.

Zampitella, gang boss for McCarthy, and as such responsible for the safety of his gang, testified about the events leading up to the accident. He stated that the longshoremen reported to work at 1:00 p. m. on February 7, but had to wait three hours for the ship to arrive. Following his inspection of the vessel for safety the longshoremen boarded it sometime between 4:00 p. m. and 5:00 p. m. and cargo operations began at Number 2 and 3 hatches. While working there, the men discovered that there was ice on top of the containers and they complained to Zampitella, who made a request to the ship's mate for rock salt or other nonskid material. The request was made about two hours after the operation began. By midnight, following several subsequent requests, Zampitella was doubtful that Lines would provide such material.

In accordance with the stevedore's normal procedure, Zampitella additionally informed Kloss, the stevedore superintendent, of the ice. Kloss was responsible for supervising the loading and discharging of cargo on the vessel to make sure it was properly placed in the correct location. Kloss stated that the stevedore had a spare supply of nonskid material in a gear locker about 800

---

1. A "pineapple" is a steel device which looks something like a fruit pineapple in appearance, and is used as a brace. The following is a description of a "pineapple" by Zampitella, gang boss, at T. 42: "We call them pineapples. They are square; they are about four or five inches in diameter around—square, rather—

and they point up, sort of like a pyramid." A more exact description is not contained in the record or briefs.

2. This was common stevedoring practice. See T. 648–649.

feet from the ship. There is no evidence that this was used to remedy the slippery condition of the containers. He also testified, over plaintiff's objection, that such a condition should be alleviated by the stevedore and that if it became too dangerous, the longshoremen could cease work.

Cargo operations continued. At 1:30 a. m., on February 8, approximately nine hours after the stevedore gang began working, the plaintiff was lifted onto the top of one of the containers which had been fully exposed to the weather during the trip from New York to Philadelphia. He noticed that a pineapple, which should not have been there, was inserted into the edge of the container, and that there was ice on top of the unit. In order to remove this pineapple, the plaintiff ventured out to the end of the container, where he slipped on the ice and fell from 25 to 30 feet down to the main deck of the vessel. He sustained injuries.

Rich sued pursuant to 33 U.S.C. § 905(b).[3] He alleged in his complaint, *inter alia*, that his injury was proximately caused by the defendant's negligence in failing to remedy the icy condition of the containers. The case was permitted to go to the jury. It found that Lines was negligent, that this negligence was the proximate cause of Rich's accident, and that Rich himself was 50% contributorily negligent. Accordingly, his stipulated damages in the amount of $30,000 were reduced to $15,000. The court did not charge on the liability of Lines.

## I. JURISDICTION

This court has jurisdiction of the appeal. Lines filed post-trial motions for judgment N.O.V. and alternatively, for a new trial. The lower court granted defendant's motion for judgment N.O.V., but failed to rule on the motion for a new trial as required by F.R.C.P. 50(c). The new trial motion has not been decided but the following appears in Lines' brief: "[D]efendant hereby waives determination of its motion for new trial and therefore, certifies this Court has jurisdiction pursuant to 28 U.S.C. § 1291." Whether or not the waiver aids jurisdiction is an issue which we need not discuss. See, *Readnour v. Commercial Standard Ins. Co.*, 253 F.2d 907 (10th Cir. 1958); *Robinson v. Isbrandtsen Co., Inc.*, 203 F.2d 514 (2d Cir. 1953); *Mays v. Pioneer Lumber Corp.*, 502 F.2d 106, 110 (4th Cir. 1974), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975); *Posttape Associates v. Eastman Kodak Co.*, 68 F.R.D. 323 (E.D.Pa.1975), *rev'd on other grounds*, 537 F.2d 751 (3d Cir. 1976). See and compare *Lowenstein v. Pepsi-Cola Bottling Co. of Pennsauken*, 536 F.2d 9 (3d Cir. 1976), *cert. denied*, 429 U.S. 966, 97 S.Ct. 396, 50 L.Ed.2d 334 (1976). We can see no reason why the learned district judge did not obey the rule which is cogently stated and easily understandable. He should have done so.

## II. LAW

Plaintiff raises three issues on appeal. First, he argues that the trial judge erroneously granted judgment notwithstanding the verdict[4] in favor of Lines.

---

**3.** Rich's accident took place on February 8, 1973, well after November 26, 1972, at which time 33 U.S.C. § 905(b) went into effect. 33 U.S.C. § 901 (1976). *Burris v. Global Bulk Carriers, Inc.*, 505 F.2d 1173, 1178 n. 9 (3d Cir. 1974).

**4.** As part of its decision granting judgment notwithstanding the verdict, the district court held after examining the evidence in a light most favorable to Rich, that he did not produce sufficient evidence to establish a legal theory upon which his case could be submitted to the jury and that he therefore had no cause of action under § 905(b). Our scope of review, as a result is to examine the record, also in a light favorable to the plaintiff, and then determine

whether this conclusion was correct as a matter of law. Cf. *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781 note 4 (3d Cir. 1978). In this case, our standard of review is "to view the evidence in the light most favorable to the party secur[ing] the verdict, drawing all reasonable inferences that the jury might have drawn to support its decision." *Monsen v. Consolidated Dressed Beef Co., Inc.*, 579 F.2d 793, 796 (3d Cir. 1978), cert. denied sub nom. *First Pennsylvania Bank N.A. v. Monsen*, — U.S. —, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). See also *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1197 (3d Cir. 1978); *Neely v. Martin K. Eby Construction Co.*, 386 U.S. 317, 327, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967).

Specifically, appellant alleges that there was sufficient evidence for his case to be submitted to the jury based on Section 414 and/or Sections 281–283 and 302A of the Restatement (Second) of Torts.[5] Second, he contends that the district court mischaracterized its own charge by concluding that it was based on an incorrect theory of ultimate control when it was entirely consistent with our former decisions construing Section 905(b); and that therefore, the jury verdict was arrived at properly and should be reinstated. Third, appellant alleges that the issue of Rich's contributory negligence was improperly submitted to the jury since the trial record was devoid of any evidence supporting such a finding. In view of our decision, for the reasons stated immediately hereinafter, that the district court properly granted judgment notwithstanding the verdict, it is unnecessary for us to pass upon the second and third issues raised by Rich.

**A**

■■■■ Section 905(b), in pertinent part, provides: "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party . . . and the employer shall not be liable to the vessel for such damages . . . . If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel." Thus, the only time a longshoreman may maintain a suit against a vessel owner is when the latter is negligent and when this negligence is the proximate cause of the longshoreman's injury. The vessel owner is prohibited from seeking indemnification from the stevedore[6] and the longshoreman is prohib-

---

**5.** Section 414 states, "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

Sections 281–283 and 302A state the following:

§ 281. Statement of the Elements of a Cause of Action for Negligence
The actor is liable for an invasion of an interest of another, if:
(a) the interest invaded is protected against unintentional invasion, and
(b) the conduct of the actor is negligent with respect to the other, or a class of persons within which he is included, and
(c) the actor's conduct is a legal cause of the invasion, and
(d) the other has not so conducted himself as to disable himself from bringing an action for such invasion.
§ 282. Negligence Defined
In the Restatement of this Subject, negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm. It does not include conduct recklessly disregardful of an interest of others.
§ 283. Conduct of a Reasonable Man: The Standard
Unless the actor is a child, the standard of conduct to which he must conform to avoid

being negligent is that of a reasonable man under like circumstances.
§ 302A. Risk of Negligence or Recklessness of Others
An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person.

**6.** Congress made it very clear that any attempts to impose indemnification agreements on the stevedore were void as against public policy. "Under the proposed agreements the vessel may not be contractual agreement or otherwise require the employer to indemnify it, in whole or in part, for such damages. House Report No. 92–1441, 92d Cong.2d Sess. (1972), reprinted in [1972] U.S.Code Cong. & Admin. News, pp. 4698, 4705. Accordingly, it is not surprising that courts have been unwilling to enforce such agreements. *Meredith v. A & P Boat Rentals, Inc.,* 414 F.Supp. 788 (E.D.La. 1976); *Swans v. United States Lines,* 407 F.Supp. 388 (E.D.Pa.1975); *Landon v. Lief Hoegh and Co., Inc.,* 386 F.Supp. 1081 (E.D.N. Y.1974) aff'd, 521 F.2d 756 (2d Cir. 1976), cert. denied sub nom. *A/S Arcadia v. Gulf Insurance Co.,* 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 935 (1976); *Lucas v. "Brinknes" Schiffahrts Ges.,* 379 F.Supp. 759 (E.D.Pa.1974) (three judge panel). But see *Griffith v. Wheeling-Pittsburgh Steel Corp.,* 521 F.2d 31 (3d Cir. 1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976).

ited from maintaining suit against the stevedore-employer.[7]

By enacting Section 905(b), Congress achieved three basic goals, albeit with various degrees of success. First, it overruled *Seas Shipping Company v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946) and *Ryan Stevedoring Co. v. Pan Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). The former extended the strict liability doctrine of unseaworthiness to longshoremen thereby permitting them to recover damages from a vessel owner when injured while working aboard his ship even though the injury resulted solely from the stevedore's conduct. The latter, perhaps an inevitable result of the former, permitted a ship owner forced to pay damages as a result of the stevedore's conduct to bring an action against the employer for indemnification. The action would be brought on the grounds that the employer breached its implied warranty of workman-like performance. Thus, the stevedoring company was no longer to be held "circuitously liable for injury to its employee by allowing the employee to maintain an action for unseaworthiness against the vessel and allowing the vessel to maintain an action for indemnity against the employer." *Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 113 n. 6, 94 S.Ct. 2174, 2178, 40 L.Ed.2d 694 (1974).

Second, Congress placed a maritime employee injured while working on a vessel in the same position he would have been in had he been injured in a non-maritime work place. Therefore, a longshoreman injured while working on a vessel was no longer to be endowed with "any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as 'unseaworthiness,' 'nondelegable duty,' or the like." House Report No. 92–1441, 92d Cong., 2d Sess. (1972), reprinted in [1972] U.S.Code Cong. & Admin.News, pp. 4698, 4703 (hereinafter referred to as "House Report").

Third, Congress partially brought about an end to the increasingly complex three-party law suits which, in growing more protracted and complex, increased the cost of insurance without increasing its scope of coverage and which contributed to the generally depressed state of the maritime industry in the United States. House Report at 4702. Indeed, the "social costs of these law suits, the delays, crowding of court calendars and the need to pay for lawyers' services [had] seldom resulted in a real increase in actual benefits for injured workers." Senate Report 92–1125, 92d Cong., 2d Sess. (1972) at 4 (hereinafter referred to as "Senate Report.")[8]

In achieving these goals, Congress was required to satisfy the mutually exclusive interests of the stevedoring companies, the longshoremen, and the vessel owner. The result is a legislative scheme characterized as a "paradigm of political compromise." *Munoz v. Flota Mercante Grancolombiana, SA*, 553 F.2d 837, 840 (2d Cir. 1977). The longshoremen gave up the opportunity to secure large jury verdicts in suits against their employers and, in exchange, were assured of increased workmen's compensation

---

7. Section 905(a) of the Act provides, in pertinent part, "The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer . . . ." *See* 1A E. Jhirad, Benedict on Admiralty Section 27 at 2–25 (7th Ed. 1977), *Murphy v. Woods Hole, Martha's Vineyard, and Nantucket Steamship Authority*, 545 F.2d 235 (1st Cir. 1976).

8. Whether and to what extent Congress was successful in accomplishing this third goal remains an open question. As we noted in *Edynak v. Atlantic Shipping Inc. CIE Chambon Maclovia S.A.*, 562 F.2d 215, 218 (3d Cir. 1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978), the unseaworthiness remedy is still available to those injured prior to November 6, 1972, at which time Section 905(b) went into effect. See note 3, *supra*. Of even more significance, however, is that the amendments themselves have generated litigation which is illustrated by this and other similar actions seeking to more concretely define the negligence action included in the Act.

benefits.[9] The stevedoring employer gave up the chance to effectively defend these suits and thereby avoid court-imposed liability in exchange for the certainty of smaller, administratively determined awards. Additionally, the employer was freed from burdensome indemnification suits brought by the vessel owner under *Ryan Shipping Co., supra.* The vessel owner, in exchange for giving up its right to bring these indemnification suits, received in return legislation limiting its liability in suits brought by injured longshoremen to damages caused by its own negligence.[10]

**B**

We must interpret § 905(b) in respect to the specific rights and liabilities of the parties. An unduly expansive application of the ship's duties would vitiate the Congressional intent to do away with absolute liability for vessels. See *Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682, 687 (2d Cir. 1978) (Friendly, J., dissenting) cert. denied, —— U.S. ——, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978). However, an excessively constricted notion of a ship's duty equally defeats Congress' intention to hold a ship owner liable for injuries caused by his own negligence.[11] In discovering the middle ground between these policies, courts have looked to the Restatement (Second) of Torts for guidance and through this process they have attempted to uniformly apply Section 905(b).[12] *Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233, 1237–38 (5th Cir. 1977); *Brown v. Ivarans Rederi A/S*, 545 F.2d 854, 863 (3d Cir. 1976), cert. denied, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); *Napoli v. Hellenic Lines, Ltd.*, 536 F.2d 505, 508–9 (2d Cir. 1976); *Anuszewski v. Dynamic Mariners Corp., Panama*, 540 F.2d 757, 759 (4th Cir. 1976) (per curiam), cert. denied, 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977). However, in this Circuit, only those sections of the Restatement which are clearly consistent with the purposes and policies of the Act have been applied.[13] In applying § 905(b) and the liability of the parties thereunder, we think it necessary to call attention to previous decisions of this court.

*Brown v. Ivarans Rederi A/S, supra,* was the first occasion we had to pass on the standard of care to be imposed upon a vessel owner in an action brought under Section 905(b). A longshoreman was injured while employed by an independent stevedore hired to unload angle iron. Because of

9. The Act was amended to "provide that the maximum compensation for disability shall not exceed 200% of the national average weekly wage to be determined annually by the Secretary of Labor. The expectation is that a 200% maximum will enable approximately 90% of the work force covered by this Act to receive ⅔ of their average weekly wage." House Report at p. 4700.

10. For a more detailed analysis of the legislative history of § 905(b) see *Hurst v. Triad Shipping*, 554 F.2d 1237, 1242 (3d Cir. 1977), cert. denied, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *Griffith v. Wheeling-Pittsburgh Steel Corp.*, 521 F.2d 31, 38–41 (3d Cir. 1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976); *Munoz v. Flota Mercante Grancolombiana, SA*, 553 F.2d 837, 840 (2d Cir. 1977); *Gay v. Ocean Transport & Trading Ltd.*, 546 F.2d 1233, 1235–38 (5th Cir. 1977).

In particular, see *Villanova Law Review*, Third Circuit Review, 1977–78, Vol. 23, No. 4, *Admiralty*, at 766, *et seq.*, discussing "*Hurst v. Triad Shipping Co.* (1977)." This article covers our *Hurst* decision in every important particular.

11. "Permitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work. Thus, nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition." House Report at p. 4704.

12. "The Committee does not intend that the negligence remedy authorized in the bill shall be applied differently in different ports depending on the law of the State in which the port may be located. The Committee intends the legal questions which may arise in actions brought under these provisions of the law shall be determined as a matter of Federal law." House Report at 4705. Thus, the Restatement serves "as the national expression of non-maritime tort principles." *Hurst v. Triad Shipping*, 554 F.2d at 1248.

13. See *Hurst, supra,* n. 35 cited to the text at 1249.

empty barrels left stacked in the ship's hold, the angle iron had to be lifted through the hatch at an angle. When it became caught in the plywood separating the tiers of barrels, the plaintiff attempted to guide the angle iron away from the plywood by pulling on it as it was being hoisted out of the hold. When he did so, however, the angle iron swung towards him and, to avoid being hit, he tried to climb up the side of the hold. He grabbed at a sweat batten clip which came out of the rib of the ship into which it was fastened and the longshoreman fell about fifteen feet onto the angle iron.

The jury returned a verdict in favor of the plaintiff and the vessel owner appealed contending that the trial judge's instructions, which were based on Section 416 of the Restatement (Second) of Torts,[14] were erroneous. We agreed. Writing for the court, Judge Van Dusen analyzed the theoretical basis of Section 416, concluding that it was based on the concepts of non-delegable duty and vicarious liability. Since both of these concepts were inconsistent with the intent of Congress to place major responsibility of safe working conditions on the stevedore, he held that the charge was erroneous. Remanding the case for further proceedings, Judge Van Dusen also stated: "It would appear that the principles of the law of negligence, as adopted in the admiralty field during the history of our country, are to form the basis of any recovery against shipowners insofar as such principles are not inconsistent with 905(b). *See,* *e. g.* . . . Sections 281–83, 302A, 305 and 452, Restatement (Second) of Torts. . . ." *Id.* at 863.

The second time we addressed the issues presented here was in *Marant v. Farrell Lines, Inc.,* 550 F.2d 142 (3d Cir. 1977). In that case a longshoreman was injured while unloading bags of cocoa beans which were allegedly stowed improperly and which, as a result, collapsed. The bags were stowed under the direction of the vessel's officers. Following a jury verdict for the plaintiff, the vessel owner filed an appeal in which he contended the jury instructions imposing concurrent or joint responsibility on both the stevedore and vessel owner was violative of Section 905(b). Remanding the case to the district court in light of *Brown,* we stated, "To say that responsibility is concurrent or joint is plainly inconsistent with the intention of the act to place primary responsibility [for the longshoreman's safety] on the stevedore." *Id.* at 144.

In the last case before us dealing with § 905(b), *Hurst v. Triad Shipping Co.,* 554 F.2d 1237 (3d Cir. 1977), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977), the facts were as follows: Two longshoremen employed by an independent stevedore were injured while unloading steel coils from the S.S. Island Archon. They were using a shore-based crane owned and operated by the stevedore. At the end of the crane's cable was a large open hook from which two lower cables were suspended by loops, known as eyes. At the end of one of these cables was a second hook and at the end of the other was a braided cable. By pulling the cable through the steel coil and attaching it to the lower hook, the cargo was able to be hoisted out by the crane. The hook from which the lower two cables were attached lacked a safety catch to prevent them from slipping off and falling. While lowering these two cables, a clamp securing the eyes caught on the side of the hatch opening. As a result, when additional cable was lowered, the eyes were lifted off of the hook and the lower two cables became disconnected from the crane. They fell on top of the two longshoremen, who incurred serious injuries.

---

**14.** Restatement (Second) of Torts § 416 provides:

"§ 416. Work Dangerous in Absence of Special Precautions

One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others un-

less special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

The district judge granted the defendant's motion for summary judgment, the plaintiffs appealed, and we affirmed. Writing for the court, Judge Hunter stated that the longshoring company had the status of an independent contractor and that land-based principles should be applied in formulating the standard of care to be applied under 905(b); that in doing so, this and other courts have turned to the Restatement (Second) of Torts; that Section 409 [15] which applies to independent contractors is the provision of the Restatement which is both factually applicable and consistent with the policies and purposes of the Act; that the only exception to Section 409 which similarly comports with the Act is Section 414; [16] and that the plaintiffs failed to adduce sufficient evidence to bring the vessel owner within that provision by demonstrating the owner had control over the stevedore's operation. He concluded, "Because the district judge correctly decided that holding the vessel owner to such a duty of supervision would violate the thrust of amended Section 905(b), he properly withdrew the case from the jury." 554 F.2d at 1253.[17] We must follow this gonfalon. The ruling constitutes the law of this Circuit.

## C

Plaintiff first contends that sufficient evidence was presented on which to base a finding that Lines controlled the stevedore's operation within the meaning of Section 414 and that accordingly his case should have been submitted to the jury for a determination of defendant's liability. This evidence consisted of a statement by Donald Penny,[18] the third mate aboard the Alliance, and testimony by Captain Kenneth Mistry, plaintiff's expert witness in the area of stevedore and ship-board safety.

Penny stated that he was aware of the practice of longshoremen walking on top of containers in order to load and unload cargo and that this method of operation was used during February of 1973 (T. 299). He further stated that if a vessel arrived in port with an ice-covered deck, he would provide the longshoremen working on board the ship with nonskid material kept on the ship for this and other purposes, provided the longshoremen requested the material (T. 299–300).[19]

Captain Kenneth Mistry's [20] testimony was more detailed. He stated that the chief officer of a ship is in charge of cargo operations and in that capacity instructs the longshoremen which containers are to be loaded, removed or shifted around (T. 650). In addition, the officer must keep the ship in a condition to receive and discharge cargo and is in charge of general ship maintenance (T. 641). As part of these duties, the chief officer, or those to whom his powers are delegated, must always be concerned

**15.** Section 409 states, "Except as stated in Sections 410–429, the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." The exceptions, other than § 414, are not relevant here.

**16.** See note 5, *supra.*

**17.** In *Hurst,* Judge Hunter also quoted the House Committee Report: "The Committee believes that where a longshoreman or other worker covered under this Act is injured through the fault of the vessel, the vessel should be liable for damages as a third party, just as land-based third parties in non-maritime pursuits are liable for damages when, through their fault, a worker is injured. . . .

"The purpose of the amendments is to place an employee injured aboard a vessel in the same *position he would be if he were injured in* non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as 'unseaworthiness,' 'non-delegable duty', or the like . . . ."
House Report at pp. 4702–04. See *Hurst,* at n. 25 cited to text at 1247.

**18.** Penny's statement was from a deposition taken on July 2, 1975 and was read into the record. He was not available to testify at trial.

**19.** George Hatta, the chief mate on board the Alliance, similarly testified that, if asked, he would supply nonskid material (T. 431), as did Erline Johnson, another of the ship's officers (T. 477).

**20.** For the qualifications of Captain Mistry, see T. 636, *et seq.*

that the vessel is safe for both the long-shoremen and crew members. Captain Mistry further testified that he had followed procedures whereby slippery conditions either on the deck or on top of the cargo left exposed to the weather were remedied by the ship's crew (T. 653) and that in his opinion, the dangerous conditions of the containers should have been alleviated by the ship's personnel since they alone were aware of the weather conditions encountered during the voyage to Philadelphia and since they were aware that the longshore-men would be walking on top of the containers (T. 661–63).

Although plaintiff seeks to rely on Penny's statement, *supra*, as an admission by the defendant that the vessel owner retained control, possession and responsibility of the vessel during cargo operations, and although plaintiff construes Captain Mistry's testimony, *supra*, as establishing defendant's control over the cargo operations, we find that this evidence alone does not bring Lines within the ambit of Section 414. Comment C specifically states: "In order for the rule stated in this Section to apply, the employer must have retained at least some control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Accordingly, the critical evidence needed to impose liability under Section 414 is that of the vessel owner's control over the operative detail of the stevedore's work.

■ This evidence does not exist in the present case. The testimony suggested only that the vessel owner was aware that the longshoremen would walk on top of the containers; that, if asked, the vessel owner would supply non-skid material; that the vessel's officers exercised the limited role in these cargo operations of instructing the longshoremen which containers were to be loaded, removed, or shifted; and that the vessel owner must keep the ship in a condition fit to receive and discharge cargo. As Captain Mistry himself stated, "[T]he long-shoremen come aboard the vessel. the long-shoremen have a certain job to do, i. e. to load cargo or discharge cargo or shift cargo, whatever. But the duty officer oversees the operation. That does not mean he is going to tell the longshoreman, 'Put the sling this way,' 'put it that way.' He's not going into those specific details of it." (T. 642–43)

Therefore, because the vessel owner exercised supervision over these operations only to the extent that it told the stevedore which containers to load, discharge or shift, and because there is no evidence suggesting the vessel owner was involved in decisions with respect to the manner in which these tasks would be accomplished, we conclude that the district court was correct in holding that liability could not be imposed on the defendant under Section 414. *Hurst v. Triad Shipping Co., supra* at 1251–53. *Compare Lubrano v. Royal Netherlands Steamship Co.*, 572 F.2d 364 (2d Cir. 1978) (evidence was sufficient to permit jury to find ship's officers had joined in directing that longshoremen should continue to work even though there was insufficient dunnage, which was to be supplied by defendant, and that it was error to grant vessel owner's motion for directed verdict) and *Butler v. O/Y Finnlines, Ltd.*, 537 F.2d 1205 (4th Cir. 1976), *cert. denied*, 429 U.S. 897, 97 S.Ct. 260, 50 L.Ed.2d 180 (1976) (where mate instructed longshoremen to place counterweight in location objectionable to longshoremen, ship owner's motion for directed verdict was erroneously granted) with *Cox v. Flota Mercante Grancolombiana, SA*, 577 F.2d 798 (2d Cir. 1978) (where evidence shows that boom operated solely by stevedore dislodged a beam which fell and injured longshoreman and where stevedore was wholly entrusted with cargo operation, district court erroneously entered

judgment on jury verdict in favor of plaintiff), and *Hickman v. Jugoslavenska Linijska*, 570 F.2d 449 (2d Cir. 1978) (per curiam) (where contract between stevedore and vessel owner required stevedore to load and lay dunnage boards as required, and where longshoreman was injured from inadequate dunnage, district court erroneously permitted case to be submitted to the jury since vessel owner had no control over the stevedoring operation).[21]

▉▉▉ Plaintiff next contends that even if he did not satisfy the requirements of Section 414, the trial court erred in granting judgment notwithstanding the verdict by not considering whether negligence could have been imposed under Sections 281–83 and 302A of the Restatement. Although we agree that the district court should have examined the evidence submitted by the plaintiff in light of these provisions of the Restatement prior to granting Lines' motion for judgment notwithstanding the verdict, it does not follow that we are precluded from affirming the decision. It seems generally established that an appeals court may affirm a decision granting summary judgment or judgment notwithstanding the verdict based on a theory different from that of the district court so long as the parties have had the opportunity to present all the available evidence. *United States v. General Motors Corp.*, 171 U.S.App.D.C. 27, 47–48, 518 F.2d 420, 440–441 (1975); *Paskaly v. Seale*, 506 F.2d 1209, 1211 n. 4 (9th Cir. 1974); *Archer v. United States*, 217 F.2d 548 (9th Cir. 1954), *cert. denied*, 348 U.S. 953, 75 S.Ct. 441, 99 L.Ed. 745 (1955). In this regard, we note the plaintiff argues in his brief that the jury was justified in finding the defendant negligent based on these provisions of the Restatement as charged by the trial court. (Brief of Appellant at 31). Further, at no time did he request a new trial to enable him to produce additional evidence. We thus conclude that, since plaintiff perceived his case to be based at least in part on these provisions, he presented all relevant facts available to him bearing on defendant's negligence. Therefore, no interest would be served by a remand on this issue and we proceed to the merits of this argument. *Sprague v. Fitzpatrick*, 546 F.2d 560, 563 n. 4 (3d Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *Beth-*

---

**21.** The cases we have just cited do not in any way detract from our observations that Sections 343 and 343A of the Restatement (Second) of Torts, upon which these decisions purport to rest, are both inconsistent with Section 905(b) and therefore should not be relied upon to create a duty on the part of the ship owner.

"35. Although they do not raise the point on appeal, appellants argued below that Restatement (Second) of Torts §§ 343–43A (1965) applied to the facts in the case *sub judice*. These sections, which according to § 343, Comment *a*, must be read together, provide as follows:

" '§ 343. Dangerous Conditions Known to or Discoverable by Possessor

'A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.'

" '§ 343A. Known or Obvious Dangers

'(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

'(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated.' We do not believe these sections are apposite." *Hurst v. Triad Shipping Co.*, 554 F.2d at 1249 n. 35. Indeed, the Second Circuit, which has adopted these provisions, has not done so without considerable difficulty. As Judge Friendly stated, "In retrospect it seems to have been a mistake for courts to give such talismanic significance to §§ 343 and 343A of the Restatement of Torts 2d as has sometimes been done. These sections are awkwardly drafted; the framers had no notion that they would be applied to the tangled situations of ship loading or unloading; and they must be read together with Chapter 15, 'Liability of an Employer of an Independent Contractor'." *Canizzo v. Farrell Lines, Inc.*, 579 F.2d at 688 (Friendly, J., dissenting).

*lehem Mines Corp. v. United Mine Workers of America,* 494 F.2d 726, 736 (3d Cir. 1973).

■ The evidence upon which plaintiff bases his second argument consists of statements made by Zampitella that those working in his gang told him of icy conditions shortly after they began working onboard the vessel (T. 38–39), that he requested some salt or other nonskid material during the first hour they were working (T. 53), and that these requests continued for the next several hours but to no avail (T. 105). Plaintiff further draws the inference that the dangerous condition existed at the time the vessel arrived in Philadelphia since the ship encountered light rain and snow while on its voyage (T. 314–15) but did not encounter any precipitation in Philadelphia from the time of its arrival until the time Rich was injured (T. 323). Lastly, plaintiff argues that the vessel owners were aware the longshoremen would be walking on top of the containers left exposed to the weather conditions (T. 298–99) and that the defendant was similarly aware of the icy conditions as a result of Zampitella's requests (T. 63). We are thus asked to hold that when a vessel owner knows or has reason to know that the stevedore is not providing a safe working area, the vessel owner has an independent duty to provide such an area and that its failure to do so constitutes negligence. On the facts of this case, we decline to do so.

■ This standard of liability which plaintiff seeks to impose on the vessel owner is derived in large part from Section 302A of the Restatement. We restate the language: "An Act or omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person." However, this provision assumes the existence of a duty owed by the actor to the injured party. Comment A to Section 302, incorporated by reference as Comment A to 302A states: "This Section is concerned only with the negligent character of the actor's conduct, and not with his duty to avoid unreasonable risk. . . . The

duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relation between the actor and the other which gives rise to a duty. . . . If an actor is under no duty to the other to act, his failure to do so may be negligent conduct within the rule stated in this Section, but it does not subject him to liability because of the absence of a duty." Accordingly, the fact that the vessel owner knew of the dangerous condition of the containers becomes relevant in determining his liability for Rich's injuries under Section 905(b) only if a duty existed on the part of the vessel owner to take some action to remedy the ice.

■ Plaintiff seeks to demonstrate the existence of this duty by invoking several passages from the Act's legislative history. First, he cites the following portion of the House Report submitted with the Act: "Permitting actions against the vessel based on negligence will meet the objectives of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work. Thus nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition." House Report at p. 4704. Second, he analogizes the present case to a hypothetical included in the Act's legislative history wherein a longshoreman, injured by an oil spill on the vessel's deck, may recover from the vessel owner if it put the oil on the deck, or knew that it was there, and willfully or negligently failed to remove it or if the oil was on the deck for a period of time during which the vessel owner, in the exercise of reasonable care, should have discovered and removed it. House Report at pp. 4703–4.

Based on these passages, plaintiff concludes that Congress intended a vessel owner be liable to encourage safety; that to achieve this goal, liability should be imposed on the vessel owner even when it only has knowledge of a slippery substance on the deck of its ship; that it is possible for the

vessel owner and stevedore both to be negligent in failing to remove this substance but for the ship owner alone to be held liable; that, since the vessel owner knows or has reason to know that the longshoreman will walk on both the ship's deck, and the container tops they are the functional equivalents; and that therefore to impose liability on the vessel owner is entirely consistent with the Act.

The difficulty with plaintiff's argument is that there is no evidence supporting his position that the deck and container top are essentially the same. Clearly he carried the burden on this issue. He was required to present evidence demonstrating that the custom and practice of the industry was such that the vessel owner would normally assume responsibility for the tops of the containers, just as it would normally assume responsibility for the condition of the decks and passage-ways. See e. g., *Canizzo v. Farrell Lines, supra,* (vessel owner liable when longshoreman slipped and fell on deck because of cluster lights placed on top of patches of grease); *Darwin v. United States,* 435 F.Supp. 501 (N.D.Cal.1977) (vessel owner liable when longshoremen slipped on ramp leading from lower tween deck to lower hold of ship); *Davis v. Inca Compania Naviera S.A.,* 440 F.Supp. 448 (W.D.Wash. 1977) (vessel owner liable when longshoreman slipped on wet wheat chaff on vessel's deck when ship owner had knowledge of the dangerous condition and when condition prevented longshoremen from having safe access to work site); *Dodge v. Mitsui Shintaku Ginko, K.K.,* No. 73–852 (D.Or.1974), aff'd 528 F.2d 669 (9th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976) (vessel owner negligent when longshoreman slipped and fell on snow allowed to accumulate on deck of ship).

This burden was not met. The closest plaintiff came to demonstrating the vessel owner would normally assume responsibility for the slippery condition was the following testimony from his expert witness, Captain Mistry:

THE COURT: May I just ask you this. Is it your statement, when longshoremen were coming on board your ship to unload cargo, if that cargo had ice or snow on it, that you told the longshoremen to stand back while your seamen cleaned up the cargo for them?

THE WITNESS: Yes. I would try to keep that cargo clear for the longshoremen.

THE COURT: That was the manner in which you did it?

THE WITNESS: That's the manner in which I did it, and that's the manner I have seen many ships come in. They try to keep the surface free of such slippery matter.

We go on many ships right now as a surveyor, and go on the ship right after it docks. On deck sometimes there is ice patches here and there, and we are seeing that the snow has been cleared out where we are expected to walk.

THE COURT: Now, you are talking about in the usual places where people are expected to walk. I am talking about if you had containers. You worked container ships?

THE WITNESS: Yes, sir.

THE COURT: You worked container ships three-high?

THE WITNESS: Right.

THE COURT: Is it your testimony that when snow was on top of those containers your seamen went up and shoveled off the snow and put down some type of material; and that the longshoremen did not do that, your seamen did that?

THE WITNESS: I have seen it, yes.

THE COURT: I asked you: Is that what your seaman did, instead of the longshoreman?

THE WITNESS: As I said, I did not sail on a container ship. I did not have that situation. But when we had deck cargo, and we expected people to go on top of that deck cargo—there would be sometimes hard pieces, tall pieces—we would have put non-skidding material on such cargo. (T. 654–55)

■ Without more, this testimony establishes only that when *deck cargo* was aboard a vessel and when people were expected to walk on top of it, the vessel owner would place non-skid material on top of it. The testimony does not establish any practice with respect to container ships. Significantly, at no time was Captain Mistry asked exactly what the custom and practice of the trade was with respect to the obligations of the vessel owner and stevedore to clear the tops of the containers, nor did he ever state that, as a vessel captain, he took it upon himself to do so. Indeed, he admitted that he was never in charge of a container ship. As a result, we cannot agree that what constitutes "appropriate" vessel action required to remedy a slippery deck is the same as that necessitated by slippery container tops.[22]

■ The second reason we conclude the statute does not impose a duty on the vessel owner in this case is because of that portion of the Act which imposes primary responsibility for the longshoreman squarely on the stevedore. As we indicated in *Brown v. Ivarans Rederi A/S*, 545 F.2d at 860–61, Congress retained Section 941(a) of the unamended Act when it modified this legislation in 1972. That section provides: "Every employer shall furnish and maintain employment and places of employment which shall be reasonably safe for his employees in all employments covered by this Chapter and shall install, furnish, maintain, and use such devices and safeguards with particular reference to equipment used by and working conditions established by such employers as the Secretary may determine by regulation or order to be reasonably necessary to protect the life, health, and safety of such employees, and to render safe such employment and places of employment, and to prevent injury to his employees." The reason it left this provision unchanged was to insure that the primary responsibility for the longshoremen's safety would remain on his employer, the stevedore, who was best able to provide and maintain a safe place in which to work: "It is important to note that adequate workmen's compensation benefits are not only essential to meeting the needs of the injured employee and his family, but, by assuring that the employer bears the cost of unsafe conditions, serve to strengthen the employer's incentive to provide the fullest measure of on-the-job safety.

■ "This consideration is particularly crucial with respect to high-risk occupations such as those covered by this Act. Longshoring, for example, has an injury frequency rate which is well over four times the average for manufacturing operations. It is the Committee's view that every appropriate means be applied toward improving the tragic and intolerable conditions which take such a heavy toll upon workers' lives and bodies in this industry, and such means clearly include vigorous enforcement of the Maritime Safety Amendments of 1958 and the Occupational Safety and Health Act of 1970, as well as a workmen's compensation system which maximizes industry's motivation to bring about such an improvement." Senate Report at 2.

This component of the Act is of considerable importance in determining the scope of a vessel owner's duty toward the longshoreman. It is a reminder that the underlying purpose of the Act is to encourage safety on the waterfront within the framework of the relationship established between the stevedore on the one hand and the vessel owner on the other. Thus, in order to impose liability on the vessel owner under Section 905(b), we must be sure that it and not the stevedore is in the position best able to prevent similar accidents from arising in the future.[23]

22. Plaintiff further argues that the vessel owner carried rock salt, sand and sawdust. However, since there is no evidence that the longshoremen were relying on the vessel owner to supply the material, and since it was used for slippery deck conditions, ship repairs and fire- fighting (T. 423, 386), this evidence does not directly bear on defendant's duty to supply it.

23. Indeed, under the terms of 33 U.S.C. Section 933, "if the injured longshoreman won his third-party suit, the employer stevedoring com-

Clearly, the stevedore was best able to prevent such an accident as this from occurring in the future. It was hired as an expert by the vessel owner to load, unload and shift cargo. Zampitella testified in this regard that the ship's personnel do none of the physical work with respect to the containers (T. 65) and Donald Penny stated that it is the stevedore's personnel who decide how a container is to be moved from one location to another (T. 298). Further, Captain Mistry indicated that the purpose of hiring the stevedore was to bring on board men who are experts in handling containerized cargo (T. 669). As a result, it is the stevedore and not the vessel owner who is most intimately familiar with the procedures to follow in order to safely load, unload and shift cargo and who is best able to assess the relative dangers its employees will face. *Cf. Munoz v. Flota Mercante Grancolombiana,* 553 F.2d 837, 840–41 (2d Cir. 1977).

■ Accordingly, since there is no evidence suggesting the deck and container tops are the functional equivalent, and since the stevedore is in the position best able to prevent this type of accident from occurring in the future, we conclude that the statute does not impose a duty on the vessel owner to supply the requested nonskid material.

Plaintiff next seeks to establish the existence of this duty by turning to our former decisions of *Brown v. Ivarans Rederi A/S, supra, Marant v. Farrell Lines, supra,* and *Hurst v. Triad Shipping, supra.* He argues that *Brown* is applicable to the present case since there, as here, the longshoreman was injured as a result of an unsafe condition aboard the vessel which its owner failed to correct, even after it was notified of the condition. He further contends that *Marant* is analogous to the instant case since the dangerous condition causing the longshoreman's injury there, as here, was the condition of the cargo. Finally, he distinguishes *Hurst* from the instant case since there the vessel officers had no actual knowledge of the dangerous condition which ultimately caused the longshoreman's injury while here the vessel owner was aware of the ice on top of the cargo containers.

This characterization of our decisions overlooks the fact that the conditions causing the longshoreman's injury play just as significant a role in determining the vessel owner's liability as does his knowledge of the condition itself. In *Brown* we indicated that the longshoreman's injury was caused by barrels left stacked in the hold and that there was some evidence suggesting the longshoremen needed the vessel owner's permission to remove them. 545 F.2d at 856. Similarly, in *Marant* we noted that the dangerous condition resulting in the longshoreman's injury was improperly stowed cargo loaded under the supervision of the vessel owner. 550 F.2d at 143. Therefore, we remanded both of these cases in light of this evidence suggesting the vessel owner was directly involved with creating the condition which resulted in the longshoreman's injury. Here, in contrast, the vessel owner's sole involvement in the events leading up to Rich's injury amounted to taking no action to remedy a condition of the cargo not customarily his responsibility.

In addition to ignoring the nature of the conditions causing the longshoreman's injuries discussed in our prior decisions, plaintiff's reading of *Hurst* would significantly alter the relationship between the vessel owner and the stevedore by shifting the duty owed by the stevedore to his employees to the vessel owner.[24] Rich argues that

pany or its insurance carrier would be reimbursed to the extent of the compensation award." *Johnson v. Sword Line, Inc.,* 257 F.2d 541, 546 (3d Cir. 1958); *Brown v. Ivarans Rederi A/S,* 545 F.2d at 859, n. 6. Therefore, if we would hold U.S. Lines liable so that Rich would recover a verdict against it, his employer or its insurance carrier would receive any compensation paid. The effect of this would be to remove any incentive Congress placed on the industry to develop and maintain the safest possible working conditions.

24. We note in this regard several regulations promulgated by the Occupational Safety and Health Administration concerning slippery conditions. 29 C.F.R. Section 1918.2 provides, "The responsibility for compliance with the regulations of this part is placed upon 'employ-

here, unlike *Hurst,* the vessel owner did indeed have knowledge of the dangerous condition of the cargo and, on the basis of this knowledge, should be held liable for his injuries. However, were we to make either actual or constructive knowledge the sole basis of a vessel owner's "independent duty" to assume the stevedore's obligation to provide a safe work place for its employees, the vessel owner would have to become intimately involved in the stevedore's operations. For example, under plaintiff's standard of liability, if the vessel owner in *Hurst* would have had either actual or constructive knowledge of the defective stevedoring equipment which resulted in the longshoreman's injury, and if he further had either actual or constructive knowledge that the stevedore had failed to remedy the defect, an "independent obligation" would have arisen on his part to intervene in the cargo operations and alleviate the danger. That the practical effect of this intervention would be to intimately involve the vessel owner in an operation he hired an expert to perform is irrelevant.

Similarly, in this case there is no evidence even remotely suggesting that the vessel owner would customarily assume the responsibility for alleviating the icing conditions on the containers. Indeed, the practice of the industry was for the longshoremen to gain access to the containers through the use of a shore-side crane operated by the stevedores. We find nothing in

the record which counters this custom (T. 24–25; 41; 58; 227; 648). Therefore, only the stevedore's personnel were expected to walk on the tops of the containers and in that sense their condition was no more the responsibility of the vessel owner than was a dangerous condition created by stevedoring equipment. To nevertheless hold the vessel owner had an "independent obligation" to alleviate this dangerous condition based only on his knowledge, would thus impose a "duty of supervision" on the vessel owner and would "amount once again to the establishment of a nondelegable duty." *Hurst v. Triad Shipping,* 554 F.2d at 1251. We therefore conclude that our former decisions do not suggest that, in this case, the vessel owner is liable for Rich's injury.[25]

### III.

The case is a close one and the plaintiff-appellant makes a strong argument that the ship's owner should be held liable. It can be cogently contended that the legislative history to the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901, *et seq.,* shows that a vessel may be liable under land-based theories of negligence for injuries sustained by a longshoreman, as we have demonstrated above. Specifically, the following appears: "The Committee believes that where a longshoreman or other worker covered under this Act is injured

ers' as defined in Section 1918.3(c)." That provision defines employer as "an employer any of whose employees are employed, in whole or in part, in longshoring operations or related employments, . . . " 29 C.F.R. Section 1918.-3(c). Finally, 29 C.F.R. Section 1918.91(c) states, "Slippery conditions shall be eliminated as they occur."

25. *Espinoza v. United States Lines, Inc.,* 444 F.Supp. 405 (S.D.N.Y.1978), is the only other case in which a vessel owner was sued when a longshoreman fell from the top of a cargo container. In this case, however, the longshoreman claimed his fall was the result of a dent in the top of the container. The court granted judgment notwithstanding the verdict for the defendant since the vessel owner had no knowledge or reason to know of the danger. In reaching this decision, it relied upon *Gallardo v. Westfal-Larsen & Co. A/S,* 435 F.Supp. 484

(N.D.Cal.1977), which the plaintiff urges us to follow. Under *Gallardo,* a vessel owner would be held liable for injuries sustained by a longshoreman if, *inter alia,* "(1) a condition existed in an area of the ship in which the plaintiff could reasonably be expected to work which created an unreasonable risk of harm; (2) the defendant had knowledge of the condition (actual or constructive knowledge for conditions arising before the commencement of cargo operations; actual knowledge for conditions arising after commencement of cargo operations) . . . ." *Gallardo v. Westfal-Larsen & Co. A/S,* 435 F.Supp. at 497–98. In view of the emphasis this standard places on the vessel owner's knowledge while at the same time de-emphasizing the relationship between stevedore and vessel owner, we decline to adopt it. Accordingly, *Espinoza* is not persuasive either.

through the fault of the vessel, the vessel should be liable for damages as a third party, just as land-based third parties in non-maritime pursuits are liable for damages when, through their fault, a worker is injured."

And further, and more pertinently, from the same source of legislative history: "So, for example, where a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Section 5 would still permit an action against the vessel for negligence. To recover he must establish that: 1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances. The vessel will not be chargeable with the negligence of the stevedore or employees of the stevedore.

"Under this standard, as adopted by the Committee, there will, of course, be disputes as to whether the vessel was negligent in a particular case. Such issues can only be resolved through the application of accepted principles of tort law and the ordinary process of litigation—just as they are in cases involving alleged negligence by land-based third parties. The Committee intends that on the one hand an employee injured on board a vessel shall be in no less favorable position vis a vis his rights against the vessel as a third party than is an employee who is injured on land, and on the other hand, that the vessel shall not be liable as a third party unless it is proven to have acted or have failed to act in a negligent manner such as would render a land-based third party in non-maritime pursuits liable under similar circumstances." House Report at pp. 4702–04 (1972).

But in this gray area perhaps the tell-tale color is furnished by the record itself, which demonstrates the use of a shore-side crane by the stevedore to put Rich on top of the container from which he fell (T. 24–25; 41; 58; 227; 648–649). Though this aspect of the case was not fully developed, nonetheless it seems to indicate beyond a doubt that the stevedoring company rather than the ship was in complete charge of the details of handling of the containers. We therefore, will affirm the judgment.[26]

GARTH, Circuit Judge, concurring:

I am unable to join Judge Biggs' excellently crafted opinion because of my fundamental disagreement with the Majority's interpretation of the scope of the negligence action made available to longshoremen under section 5(b) of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901 et seq. (1976). The Majority has construed the statute in a manner which effectively rejects any theory of vessel liability based on land-based concepts of negligence[1] despite the fact that the legislative history concerning the 1972 Amendments to the LHWCA indicates that Congress intended to predicate vessel liability upon such concepts.

---

**26.** Since Sections 281–283 of the Restatement (Second) of Torts do not in themselves impose a duty, our analysis of this element of liability made concerning Section 302A applies to these sections as well. Comment "a" to Section 283, for example, states, "This Section is concerned only with the standard of conduct required of the actor to avoid being negligent. It is not concerned with the question of when he owes to another a duty to conform to that standard." See also Comment "a" to Section 282.

**1.** While part III of the Majority Opinion might be read as evidencing the Majority's recognition that a vessel may be liable to a longshoreman under land-based theories of negligence, the Majority has stated quite plainly in footnote 21 "that Sections 343 and 343A . . . are both inconsistent with Section 905(b) and therefore should not be relied upon to create a duty on the part of the ship owner." Maj. Op. at 551 n. 21. Since these are the only Restatement (Second) of Torts (Restatement II) provisions of relevance when the vessel is turned over to the stevedore in a dangerous condition, see pp. 547–563 infra, the Majority's decision effectively exempts the vessel from liability under land-based concepts of negligence. It is precisely for this reason that I part company with the Majority.

Based on this construction the Majority concludes that the vessel owed no duty to Rich, and thus affirms the district court's award of judgment notwithstanding the verdict. I think that this restrictive construction of the statute is incorrect, that it will lead to anomalous results in future cases, and that it will have the effect of thwarting a major Congressional purpose—the imposition of a duty on vessels to provide a safe place to work—in enacting the 1972 Amendments. In contrast, I would construe the statute as embracing land-based concepts of negligence. Construing section 5(b) in this way, I think sufficient evidence appears in the record to permit a jury to find that the vessel was negligent in failing to prevent the accumulation of ice on its container cargo or in failing to remove the ice once accumulated. This does not mean, however, that I would reverse the district court in this *particular* case despite my strong disagreement with the Majority's statutory interpretation and analysis. Because of the limited legal theories on which this case was presented in the district court, *see* p. 568 *infra*, I must conclude that it would be inappropriate to remand for a new trial. Nevertheless, it must be recognized that this case involves the interpretation of an important Congressional enactment with significant implications for the shipping and stevedoring industries. I write separately to express my views because I think that the Majority's narrow and erroneous interpretation is inconsistent with both Congressional intent and the case law as it has been developing in other circuits.

## I.

### A.

Section 5 of the Longshoremen's and Harbor Workers' Compensation Act, 33

U.S.C. § 905, was amended in 1972[2] to afford longshoremen a cause of action for injuries sustained by the negligence of a vessel:

(b) In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

As the Majority Opinion indicates, the 1972 amendments were designed to eliminate a vessel's strict liability to longshoremen under the unseaworthiness doctrine and to preclude a vessel's subsequent action for indemnification against the stevedore.[3] In return for elimination of the unseaworthiness cause of action, longshoremen benefited from substantial improvements made in

---

2. Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, Pub.L. No. 92–576, 86 Stat. 1263, 33 U.S.C. § 905(b).

3. *See* Maj. Op. at 546. For earlier discussions by this court of the circumstances leading to enactment of the 1972 amendments, *see Hurst*

*v. Triad Shipping Co.*, 554 F.2d 1237, 1241–44 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); *Griffith v. Wheeling Pittsburgh Steel Corp.*, 521 F.2d 31, 38–41 (3d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976).

the workmen's compensation program under which they are covered.[4]

Abolition of a vessel's liability under the unseaworthiness doctrine did not, however, entirely free the vessel from the duty to exercise reasonable care with respect to activities and conditions affecting the longshoremen's performance of their duties. The House Report accompanying the 1972 amendments states that "where a longshoreman or other worker covered under this Act is injured through the fault of the vessel, the vessel should be liable for damages as a third party, just as land-based third parties in nonmaritime pursuits are liable for damages when, through their fault, a worker is injured."[5] Imposition of this standard of liability would create an incentive for the vessel to provide longshoremen with a safe place to work concomitant with the creation of a mechanism by which longshoremen would be compensated for injuries caused by the vessel's negligence.[6]

However, concerned that this imposition of negligence liability might be transmuted in practice into liability under the disapproved unseaworthiness standard, the statute was drafted to caution that "[i]f [a] person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel."[7] This court has interpreted this provision of the statute as "reliev[ing] the vessel from liability for negligence caused by persons engaged in providing stevedoring services, thus preventing the imposition of liability on the vessel on some respondeat superior or absolute duty of care basis." *Griffith v. Wheeling Pittsburgh Steel Corporation*, 521 F.2d 31, 40 (3d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). More generally, this court has concluded "that the traditional, expansive maritime tort liability is not . . . to be judicially imported into section 905(b) under the guise of 'nondelegable duty' or any other synonym for liability without fault." *Hurst v. Triad Shipping Company*, 554 F.2d 1237, 1247 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977).

No necessary tension emanates from the language of the statute insofar as it impos-

---

**4.** *See* H.R.Rep. No. 92–1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 4698, 4700–01.

**5.** H.R.Rep. No. 92–1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin. News at p. 4702.

**6.** The imposition of liability for negligence will create an incentive for the vessel to take those precautions in providing a safe place to work which cost less than the expected value of the cost of accidents. *See* R. Posner, Economic Analysis of Law 122–28 (2d ed. 1977); G. Calabresi, The Costs of Accidents 135–73 (student ed. 1970).

**7.** 33 U.S.C. § 905(b).
   The provision exempting a vessel from liability for injuries caused to longshoremen by the stevedore's negligence is reinforced by 33 U.S.C. § 941(a), which requires a stevedore to provide his longshoremen-employees with a reasonably safe place to work:
   (a) Every employer shall furnish and maintain employment and places of employment which shall be reasonably safe for his em-

ployees in all employments covered by this chapter and shall install, furnish, maintain, and use such devices and safeguards with particular reference to equipment used by and working conditions established by such employers as the Secretary may determine by regulation or order to be reasonably necessary to protect the life, health, and safety of such employees, and to render safe such employment and places of employment, and to prevent injury to his employees. . . .
*See Brown v. Ivarans Rederi A/S,* 545 F.2d 854, 859–61 (3d Cir. 1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977).
   The Majority cites certain regulations of the Occupational Safety and Health Administration which would require a stevedore to eliminate slippery conditions as they occur. *See* Maj. Op. at 555 n. 24. These regulations are certainly not dispositive of the issues in this case, for the regulations also state that they are not intended *"to relieve such owners, operators,* agents or masters of vessels from responsibilities or duties now placed upon them by law, regulation or custom." 29 C.F.R. § 1918.2 (1977).

es liability on the vessel for injuries caused by its own negligence and at the same time absolves the vessel from liability for injuries caused by the negligence of the stevedore. The longshoreman is entitled to workmen's compensation benefits without regard to fault concepts when he is injured.[8] If the injuries are caused by the negligence of a third person other than the stevedore, the longshoreman may also recover against the third person in a tort action subject to the stevedore's compensation lien on the third party recovery.[9] In the case where a longshoreman is injured as a result of the negligence of both the vessel and the stevedore,[10] he would be entitled to sue the vessel in tort to recover for the injuries caused by the vessel's negligence subject to the stevedore's compensation lien for the workmen's compensation benefits to which the longshoreman is entitled.[11]

I do not understand this sort of joint responsibility to offend against the intent of Congress in enacting the 1972 amendments to the LHWCA. On the contrary, it would seem that holding the vessel accountable for its negligence, even though the stevedore has been negligent as well, is necessary to effectuate the congressional design of creating an incentive for the vessel "to exercise the same care as a land-based person in providing a safe place to work." [12]

What the 1972 amendments to the LHWCA did set out to eliminate is vessel liability on a respondeat superior or nondelegable duty of care basis.[13] Principally this means that the vessel has no general duty continually to supervise the activities of the stevedore, to assume responsibility for the condition of the stevedore's equipment, or to assume responsibility for dangerous conditions in the vessel created by the stevedore during the course of its operations (at least when the vessel has no knowledge of the dangerous conditions).[14] Certain of

8. 33 U.S.C. § 904(b).

9. 33 U.S.C. § 933.

10. The vessel might conceivably be negligent if an act or omission attributable to the vessel involved an unreasonable risk of harm to a longshoreman through the negligence or recklessness of a stevedore. Restatement II § 302A. See Brown v. Ivarans Rederi A/S, 545 F.2d 854, 863 (3d Cir. 1976), cert. denied, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977).

11. This court recognized in Marant v. Farrell Lines, Inc., 550 F.2d 142, 145 (3d Cir. 1977), that an action may be maintained by a longshoreman against a vessel when the longshoreman's injuries might be attributed to the negligence of both the stevedore and the vessel. See Edmonds v. Compagnie Generale Transatlantique, 577 F.2d 1153 (4th Cir. 1978) (en banc), cert. granted, —— U.S. ——, 99 S.Ct. 348, 58 L.Ed.2d 343 (1978); Samuels v. Empresa Lineas Maritimas Argentinas, 573 F.2d 884 (5th Cir. 1978); Dodge v. Mitsui Shintaku Ginko K.K. Tokyo, 528 F.2d 669 (9th Cir. 1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).

The existence of a cause of action in this circumstance has given rise to a difficult issue, one which I see no necessity for reaching today: whether a longshoreman's recovery against a vessel should be reduced to reflect the extent to which the stevedore's negligence had contributed to the longshoreman's injuries. Compare Edmonds v. Compagnie Generale

Transatlantique, supra (requiring reduction in recovery) with Samuels v. Empresa Lineas Maritimas Argentinas, supra (prohibiting reduction); Dodge v. Mitsui Shintaku Ginko K.K. Tokyo, supra (same); Shellman v. United States Lines, Inc., 528 F.2d 675 (9th Cir. 1975), cert. denied, 425 U.S. 936, 96 S.Ct. 1668, 48 L.Ed.2d 177 (1976) (same); Landon v. Lief Hoegh & Co., 521 F.2d 756, 763 (2d Cir. 1975), cert. denied, 423 U.S. 1053, 96 S.Ct. 783, 46 L.Ed.2d 642 (1976) (same, dicta). See the Majority and concurring opinions in Marant v. Farrell Lines, Inc., 550 F.2d 142 (3d Cir. 1977).

12. H.R.Rep. No. 92–1441, 92d Cong., 2d Sess., reprinted in [1972] U.S.Code Cong. & Admin. News, pp. 4698, 4704.

13. Hurst v. Triad Shipping Company, 554 F.2d 1237, 1247 (3d Cir.), cert. denied 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977); Griffith v. Wheeling Pittsburgh Steel Corp., 521 F.2d 31, 40 (3d Cir. 1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976).

14. Absent some special relationship, it is generally the case that the fact that a person realizes that action on his part is necessary for another's aid or protection is not alone sufficient to impose on that person a duty to act. Restatement II § 314. Whether the relationship between a vessel and a longshoreman is sufficient to give rise to a duty to act on the vessel's part, in addition to the duty to maintain the vessel in a safe condition, see id. §§ 343–343A, is an issue which I do not reach on this appeal. See id. § 314B.

these ramifications of elimination of the unseaworthiness cause of action were expressed in the legislative history as follows: [15]

Persons to whom compensation is payable under the Act retain the right to recover damages for negligence against the vessel, but under these amendments they cannot bring a damage action under the judicially-enacted doctrine of unseaworthiness. Thus a vessel shall not be liable in damages for acts or omissions of stevedores or employees of stevedores subject to this Act . . . ; for the manner or method in which stevedores or employees of stevedores subject to this Act perform their work . . . ; for gear or equipment of stevedores or employees of stevedores subject to this Act whether used aboard ship, or shore, . . . or for other categories of unseaworthiness which have been judicially established.

### B.

In view of my understanding of the liability scheme created by the LHWCA, I believe a court must construe these statutory provisions so as to give scope to the *negligence* liability imposed on the vessel, to free the vessel from liability founded upon respondeat superior or nondelegable duty doctrines, and to impose on the stevedore, with respect to its equipment and operations, primary responsibility for the safety of its longshoremen employees. These goals can be pursued more readily, I believe, if a distinction is drawn between (1) the condition of the vessel as it is turned over to the stevedore and as it is affected by subsequent activities of the vessel's crew, and (2) the activities and methods of operation engaged in by the stevedore and its employees, and the condition or type of gear or equipment utilized by the stevedore and its employees.[16] With respect to the condition of the vessel, I believe that Congress intended that the vessel be subject to the same duty as that which a landowner owes to business invitees. The duty owed by the vessel with respect to the operations and equipment of the stevedore, I would suggest, should be analogous to the duty imposed upon the employer of an independent contractor.

Section 343 of the Restatement (Second) of Torts specifies the duty owed by a possessor of land to his invitees with respect to dangerous conditions known to or discoverable by the possessor:

§ 343. Dangerous Conditions Known to or Discoverable by Possessor

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

Section 343A,[17] which must be read in conjunction with section 343, excepts the landowner from liability when the dangerous condition is known or obvious to the invitee

---

**15.** H.R.Rep. No. 92–1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin. News, pp. 4698, 4703–04 (footnotes omitted).

**16.** *See* Robertson, Negligence Actions by Longshoremen Against Shipowners Under Section 905(b) of the Longshoremen's and Harbor Workers' Compensation Act, 3 Maritime Lawyer 1 (1977).

**17.** Restatement II § 343A reads as follows:

§ 343A. Known or Obvious Dangers

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated.

unless the possessor should anticipate the harm despite such knowledge or obviousness. These are the only provisions of the Restatement II which concern the scope of a landowner's liability to invitees arising with respect to the condition of the land.[18]

Following the mandate of Congress that the duty which a vessel owes to longshoreman be defined in terms of land-based theories of negligence, I think it only appropriate that the standards set forth in §§ 343–343A be held to apply to vessels sued by longshoremen under section 5(b) of the LHWCA. The vessel is analogous to the possessor of land—the ship is the property upon which the longshoremen perform their jobs. And the stevedore and the longshoremen clearly fall within the Restatement's definition of an "invitee."[19] To apply these provisions "will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work."[20] To ignore these provisions, in contrast, would mean essentially that a vessel is free from liability to longshoremen with respect to dangerous conditions existing on the vessel at the time it is turned over to the stevedore. Such impunity would, in contravention of congressional design, place the vessel in a preferred position to the land-based person.

Support for the views I express here is to be found in a growing body of case law. In fact, the imposition of vessel liability under sections 343–343A of the Restatement II has been upheld by all of the circuits that have considered the issue.[21] A case analo-

18. When the activities of the vessel's crew are carried on in an unreasonably dangerous manner, the vessel's liability to a longshoreman injured as a consequence might be predicated upon Restatement II § 341A. This section reads as follows:

§ 341A. Activities Dangerous to Invitees
A possessor of land is subject to liability to his invitees for physical harm caused to them by his failure to carry on his activities with reasonable care for their safety if, but only if, he should expect that they will not discover or realize the danger, or will fail to protect themselves against it.

19. "Invitee" is defined in Restatement II § 332 as follows:

§ 332. Invitee Defined
(1) An invitee is either a public invitee or a business visitor.
(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.
(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.

Servants of independent contractors doing work on the premises were found to be invitees in the following cases: *Crane Co. v. Simpson*, 242 F.2d 734 (6 Cir. 1957); *Sullivan v. Shell Oil Co.*, 234 F.2d 733 (9 Cir. 1956), *cert. denied*, 352 U.S. 925, 77 S.Ct. 221, 1 L.Ed.2d 160; *Dobbie v. Pacific Gas & Electric Co.*, 95 Cal.App. 781, 273 P. 630 (1928); *Carr v. Wallace Laundry Co.*, 31 Idaho 266, 170 P. 107 (1918); *Webster Mfg. Co. v. Mulvanny*, 168 Ill. 311, 48 N.E. 168 (1897); *Lincoln v. Appalachian Corp.*, 146 La. 23, 83 So. 364, 7 A.L.R. 1697 (1919); *Hall v. Thayer*, 225 Mass. 151, 113 N.E. 644 (1916); *Jewell v. Kansas City Bolt & Nut Co.*, 231 Mo. 176, 132 S.W. 703, 140 Am.St.Rep. 515 (1910); *Stevens v. United Gas & Electric Co.*, 73 N.H. 159, 60 A. 848, 70 L.R.A. 119 (1905); *Hogan v. Arbuckle*, 73 App.Div. 591, 77 N.Y.S. 22 (1902); *Davis Bakery Co. v. Dozier*, 139 Va. 628, 124 S.E. 411 (1924).

20. H.R.Rep. No. 92–1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin. News, pp. 4698, 4704.

21. Two circuits have specifically declined to reach the issue of liability under Restatement II §§ 343–343A. *Davison v. Pacific Inland Navigation Company, Inc.*, 569 F.2d 507, 508 n.1 (9th Cir. 1978); *Anderson v. Iceland Steamship Company*, 585 F.2d 1142, 1146–48 (1st Cir. 1978). The only decision which apparently has rejected the applicability of §§ 343–343A in longshoremen's actions under section 5(b) of LHWCA is *Shepler v. Weyerhaeuser Company*, 279 Or. 477, 569 P.2d 1040 (1977). Without further elaboration, the *Shepler* court stated:

We regard as a premise, at least of the common law, that not only the existence but the nature of a duty arises out of some relationship of the parties; whatever the relationship between vessel and longshoreman may be, it is not that of occupier of *land* and invitee.

569 P.2d at 1051 (emphasis in original).
Since the longshoreman's injuries in *Shepler* were sustained as a result of the *stevedore's unsafe method of operation,* the rejection of §§ 343–343A, which are relevant to the unsafe condition of the vessel, seems to me wholly gratuitous. Although the *Shepler* court appears to have been correct in concluding that

gous on its facts to the instant appeal is *Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682 (2d Cir. 1978), *cert. denied*, —— U.S. ——, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978). In *Canizzo*, a judgment establishing a ship's liability to a stevedore was affirmed on the basis of facts indicating "[t]he existence of a substantial area of grease in a narrow passageway, which should have been known to the ship's personnel, made more dangerous by the positioning by the ship's personnel of . . . cluster lights and wires upon the greasy area . . . ."[22] Liability was sustained on the basis of Restatement II §§ 343–343A, which establish that the "possessors of land, and hence shipowners, are liable for physical harm caused to invitees by dangerous conditions which are not obvious to the invitee (§ 343), but are absolved from liability when dangerous conditions are known or obvious, except when the possessor should anticipate the harm despite the invitee's knowledge or the obviousness of the condition. (§ 343A)."[23]

*Canizzo* is the most recent in a developing line of Second Circuit cases confirming, not without some intra-Circuit conflict,[24] the availability of a longshoreman's negligence action against the vessel under Restatement II § 343. In *Lubrano v. Royal Netherlands Steamship Company*, 572 F.2d 364 (2d Cir. 1978), the court remanded the case for a new trial on a § 343 theory to determine whether the vessel, after being notified of an open and obvious danger of insufficient dunnage for a slippery cargo, required the longshoremen to keep working or joined in the stevedore's decision to do so. *Napoli v. (Transpacific Carriers Corporation and Universal Cargo Carriers, Inc.) Hellenic Lines, Ltd.*, 536 F.2d 505 (2d Cir. 1976), also involved a remand for retrial on a § 343 theory. There, the vessel was acting as its own stevedore,[25] and the longshoreman was injured when he fell from some unsecured plywood board resting on top of a deck load of drums. Snow was found both on top of and beneath the plywood, and conflicting evidence was presented as to whether the longshoreman slipped on the plywood or the plywood slipped on the drums. There was also a dispute as to whether the plywood had been placed on the drums by the ship's crew or the longshoremen. Relying on the "obvious danger" standard set forth in § 343A in remanding for a new trial, the court concluded that "a vessel is liable to longshoremen only for injuries resulting from obvious dangers which it should reasonably anticipate that the longshoremen would be unable to avoid."[26]

The Fifth Circuit was confronted, in *Gay v. Ocean Transport & Trading, Ltd.*, 546

---

the charterer's liability could be sustained under Restatement II § 410 because the charterer had directed the stevedore's method of operation, I think that the court was precipitous in dismissing §§ 343–343A before being confronted with a case involving the defective condition of the vessel.

**22.** 579 F.2d at 686.

**23.** *Id.* at 685.

**24.** In particular, the decision in *Cox v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 798 (2d Cir. 1978), *cert. denied*, —— U.S. ——, 99 S.Ct. 222, 58 L.Ed.2d 195 (1978), seems out of step with the developing case law in the Second and in other Circuits. Indeed, the court in *Canizzo* thought that the decision in *Cox* could not be fairly distinguished, *Canizzo v. Farrell Lines, Inc.*, 579 F.2d at 686 n.3, and chose instead to disapprove of the result in *Cox*.

**25.** Attempts have been made to narrow the reach of *Napoli* on this ground, *see Canizzo v.*

*Farrell Lines, Inc.*, 579 F.2d 682, 689 (2d Cir. 1978) *cert. denied*, —— U.S. ——, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978) (Friendly, J., dissenting from the holding as to liability); *Brown v. Ivarans Rederi A/S*, 545 F.2d 854, 863 n.10 (3d Cir. 1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977), but as this court recognized in *Griffith v. Wheeling Pittsburgh Steel Corp.*, 521 F.2d 31, 43 (3d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976), "[t]he vessel, even a vessel which is an employer under the Act, is relieved of liability for negligence of persons engaged in providing stevedoring services, but is not relieved of liability for its own [owner] occasioned negligence." The holding in *Napoli* was properly predicated upon the determination that a vessel is liable for its own negligence, and the negligence standards suggested in *Napoli* are applicable to vessels whether they act as their own stevedore or not.

**26.** 536 F.2d at 509.

F.2d 1233 (5th Cir. 1977), with the task of formulating the appropriate standard to be applied when a vessel is sued for its negligence under section 5(b). Although the court, in this consolidated appeal, affirmed judgments in favor of the vessels on the ground that the longshoremen's injuries were caused solely by the stevedores' negligence, the scope of the duty to be applied in section 5(b) actions was described as follows:

> "In the interests of uniformity among the courts of this circuit and throughout the federal system, we have adopted the formulation of the Restatement (Second) of Torts §§ 342, 343 & 343A (1965)."

See Samuels v. Empresa Lineas Maritimas Argentinas, 573 F.2d 884 (5th Cir. 1978) (upholding judgment in favor of longshoreman on § 343 theory). The Fourth Circuit has also approved the use of § 343 in defining the duty owed by a vessel in a negligence action commenced by a longshoreman under section 5(b). Anuszewski v. Dynamic Mariners Corporation, Panama, 540 F.2d 757, 759 (4th Cir. 1976) (per curiam), cert. denied, 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977).

I do not think that the relevant precedents of this Circuit—Brown v. Ivarans Rederi A/S, 545 F.2d 854 (3d Cir. 1976), cert. denied, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); Marant v. Farrell Lines, Inc., 550 F.2d 142 (3d Cir. 1977); Hurst v. Triad Shipping Company, 554 F.2d 1237 (3d Cir.), cert. denied, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977)[27]—necessarily preclude a longshoreman from establishing a vessel's negligence under § 343. Brown, the first decision of this court to suggest the standard of care which a vessel owes to a longshoreman, involved a situation in which a longshoreman was injured while unloading angle iron from the hold of the vessel. The unloading was accomplished by means of a winch and hoisting cables, and was performed in an unsafe manner because empty wooden barrels occupied two-thirds to three-quarters of the hatch opening through which the angle iron was removed. In view of these facts, the court tentatively proposed the following standard:[28]

> The parties in this case would have us suggest to the district court the standard of care a vessel owes to a longshoreman under the negligence remedy created by § 905(b). It would appear that the principles of the law of negligence, as adopted in the admiralty field during the history of our country, are to form the basis of any recovery against shipowners insofar as such principles are not inconsistent with § 905(b). See, e. g. Kermarec [v. Compagnie Generale Transatlantique, 358 U.S. 625,] 628, 79 S.Ct. 406, 3 L.Ed.2d 550; Socony-Vacuum Co. v. Smith, 305 U.S. 424, 431–32, 59 S.Ct. 262, 83 L.Ed. 265 (1939); [Southern Pacific v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086], supra; see also, for example, Bess v. Agromar Line, 518 F.2d 738, 740–43 (4th Cir. 1975); §§ 281–83, as well as 302A, 305 and 452, Restatement (Second) of Torts, in light of the regulations set forth in note 3 and the text at pages 855–856 above.

The court added that it found the Second Circuit's decision in Napoli v. (Transpacific Carriers Corporation and Universal Cargo Carriers, Inc.) Hellenic Lines, Ltd., 536 F.2d 505 (2d Cir. 1976), unpersuasive on the facts of the Brown appeal because Napoli "(1) relied on § 343A of the Restatement (Second) of Torts . . ., which in comment (e) is based on the doctrine of assumption of risk, specifically rejected by Congress in the 1972 legislation . . ., and (2) the vessel owner acted as its own stevedore in that case . . . ."[29]

To the extent that the court in Napoli endorsed application of the doctrine of as-

---

27. The court in Griffith v. Wheeling Pittsburgh Steel Corp., 521 F.2d 31, 44–45 (3d Cir. 1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976), specifically refrained from announcing the duty owed by a vessel in a section 5(b) action.

28. 545 F.2d at 863 (footnotes omitted).

29. Id. at 863 n.10.

sumption of risk, *Brown* did well to disapprove it. *Brown*, in my opinion, should be read as doing no more than this, however. It would be a mistake to read *Brown* broadly as eschewing the applicability of §§ 343–343A in all section 5(b) actions simply because of the reference to assumption of risk in § 343A, comment (e). These provisions of the Restatement are really the only ones which deal with a landowner's duty to exercise reasonable care with respect to the condition of his property when it is turned over to an independent contractor.[30] Excising these provisions from the scope of a vessel's duty to a longshoreman would go impermissibly far toward abrogating completely the vessel's obligation "to exercise the same care as a land-based person in providing a safe place to work," [31] an obligation which Congress avowedly intended to preserve. Much the better course, in terms of preserving the congressionally designed incentive for vessels to exercise reasonable care in providing a safe place to work, would be to apply §§ 343–343A in section 5(b) actions but to substitute for the doctrines of contributory negligence and assumption of risk insofar as they are reflected in these provisions the doctrine of comparative negligence long applied in the maritime law.[32] This is essentially the result reached by those circuits which have upheld the imposition of liability under §§ 343–343A.[33]

*Hurst v. Triad Shipping Company*, 554 F.2d 1237 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977), decided by this court after *Brown* and *Marant*, involved the issue of a vessel's liability when a longshoreman suffers injuries as a result of the *stevedore's* unsafe method of operation. The longshoremen were injured in that case when the cables suspended from a shore side crane fell upon them as a result of the manner in which the crane was operated by the stevedore. The court concluded that because the injury arose from the manner in which the stevedoring activities were conducted, the vessel could only be liable under Restatement II §§ 409, 410–15, sections covering the liability of an employer of an independent contractor for physical harm caused by an act or omission of the contractor or his servants.[34] I think this holding was unimpeachable since, with respect to the *stevedore's* activities, the vessel is simply in the position of an employer of an independent contractor.[35]

---

30. The fact that the employer of an independent contractor may be liable for physical harm caused to another by an act or omission of the contractor or his servants, as set forth in Restatement II §§ 409–29, does not preclude the imposition of liability, under Restatement II §§ 343–343A, on a landowner who hires an independent contractor to perform work on the landowner's property.

31. H.R. Rep. No. 92–1441, 92d Cong., 2d Sess., *reprinted in*, [1972] U.S.Code Cong. & Admin. News, pp. 4698, 4704.

32. This would mean that the openness and obviousness of a dangerous condition aboard the vessel would not necessarily be sufficient to discharge the vessel from liability. An inquiry into the relative fault of the vessel, stevedore, and longshoreman would be required, one which considered whether the vessel knew of the dangerous condition and might have remedied it, and whether it knew that the stevedore and the longshoreman were unlikely to take proper precautions. *See Frasca v. Prudential-Grace Lines, Inc.*, 394 F.Supp. 1092 (D.Md. 1975).

33. *See, e. g., Napoli v. (Transpacific Carriers Corp. and Universal Cargo Carriers, Inc.) Hellenic Lines, Ltd.*, 536 F.2d 505, 508–09 (2d Cir. 1976); *Riddle v. Exxon Transportation Co.*, 563 F.2d 1103, 1111–12 (4th Cir. 1977). *See also* Robertson, Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 7 J. Maritime L. & Commerce 447, 456–57 (1976); Robertson, *supra* note 16, at 11–14.

34. The *Hurst* court properly determined that Restatement II §§ 416–29 should not form the basis for vessel liability since they are rules of vicarious liability, the application of which would impose on the vessel the sort of nondelegable duty that Congress intended to abolish by the 1972 amendments. *Hurst v. Triad Shipping Co.*, 554 F.2d 1237, 1250–51 (3d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977).

35. *But see Hess v. Upper Mississippi Towing Corp.*, 559 F.2d 1030 (5th Cir. 1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1489, 55 L.Ed.2d 518 (1978), *criticized in*, Robertson, *supra* note 16, at 16–18.

The decision in *Hurst* is fully consistent with the distinction I would draw between injuries incurred by a longshoreman as a result of the stevedore's activities and equipment, and injuries incurred as a result of the condition of the vessel and the activities of the vessel's crew. *Hurst* itself recognized that courts had employed the standard set forth in §§ 343–343A when a longshoreman was injured as a result of the vessel's dangerous condition:

> Several courts have applied §§ 343–43A to create a duty in the shipowner to warn longshoremen of and protect them from dangers inhering in the ship as turned over to the stevedore. *See, e. g., Napoli v. [Transpacific Carriers, etc.] Hellenic Lines, Ltd.*, 536 F.2d 505 (2d Cir. 1976); *Croshaw v. Koninklijke Nedlloyd*, 398 F.Supp. 1224 (D.Or.1975). It was nothing about the ship or the stowage of its cargo, however, that endangered Hurst and Minus. Instead, it was the method of conducting the stevedoring activity, on a ship otherwise safe when turned over to the stevedore, that resulted in appellants' injuries. If §§ 343–43A were applied to create a duty in the shipowner to apprise himself of, to warn the longshoremen of and to protect them [*sic*] dangerous features of the independent contractor's—i. e., the stevedore's—activity, then the Restatement sections dealing with employer control over the activity of independent contractors, §§ 409–29, would be rendered nugatory with respect to landowners-shipowners.

*Hurst v. Triad Shipping Company*, 554 F.2d at 1249 n.35. As is apparent, *Hurst* held that §§ 343–343A may not be employed to impose on the vessel a nondelegable duty to supervise the stevedore's activities.[36] The court did not hold that §§ 343–343A would not apply when it was the unreasonably dangerous condition of the vessel which gave rise to the longshoreman's injuries.

## II.

Testing the facts of this case against the standard set forth in §§ 343–343A, and in those cases utilizing a theory of negligence such as I espouse here, it is evident that in normal circumstances Rich would have been entitled to take his case to the jury. The evidence which he presented was sufficient, in my view, to permit a jury to find that the vessel's duty extended to the condition of the containers which constituted the vessel's cargo, and that accordingly the vessel was negligent either (1) in failing to cover the containers with tarpaulins so as to prevent ice from forming on the container tops; or (2) in failing to remove the ice or provide nonskid materials once the ice had accumulated.[37] In light of weather conditions during the vessel's voyage to Philadelphia, the jury could have found that the vessel knew or should have known of the icy conditions. Evidence was also presented that the stevedore informed the vessel of the icy conditions. The jury could also have found that the vessel should have expected

---

**36.** *See Munoz v. Flota Mercante Grancolombiana, S.A.*, 553 F.2d 837 (2d Cir. 1977) (vessel not liable under §§ 343–343A for latent defects created by stevedore).

**37.** Illustrative of the scope of liability which Congress intended under the 1972 Amendments is the following excerpt from the legislative history:

> Permitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work. Thus, nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition.

> So, for example, where a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Section 5 would still permit an action against the vessel for negligence. To recover he must establish that: 1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances. The vessel will not be chargeable with the negligence of the stevedore or employees of the stevedore.

> S.Rep. No. 92–1125, 92d Cong., 2d Sess. 10–11 (1972).

that the longshoremen would fail to protect themselves against this danger, or that the vessel should have anticipated the harm to the longshoremen despite their knowledge of the danger or the danger's obviousness. It appears to be undisputed that the vessel exercised no care to protect the longshoremen against the danger which materialized.

As the Majority itself recognizes, numerous cases have held the vessel liable for injuries sustained by a longshoreman as a result of slippery conditions aboard ship.[38] Distinguishing these cases, the Majority concludes that judgment notwithstanding the verdict is proper in this case because Rich has failed "to present evidence demonstrating that the custom and practice of the industry was such that the vessel owner would normally assume responsibility for the tops of containers . . . ."[39] Although the distinction that the Majority would draw between decks and container tops is an intriguing one, I do not believe that the Majority's formulation of a *per se* rule absolving a vessel from liability with respect to the condition of container cargo will bear analysis. First, under pre-1972 Amendment case law, the vessel was responsible for the condition of cargo containers.[40] Although the 1972 Amendments abolished the doctrine of unseaworthiness and thereby limited to negligence the standard of care under which a vessel would be held liable, there is no indication that the 1972 Amendments intended to create a *per se* rule excluding from scrutiny under the negligence standard the vessel's actions with respect to cargo containers.[41] What the Majority has done, in effect, is to create a new rule of law. Second, the Majority's distinction does not explain why vessels are subject to liability for injuries resulting from the dangerous condition of non-container cargo.[42] There is no distinction in kind between deck cargo and container cargo; both types of cargo are under the vessel's control during the course of a voyage, but are generally turned over to the stevedore for purposes of loading and unloading. Differences in the size and shape of cargo would only be relevant, in my view, in determining whether the vessel had been negligent in its treatment of the cargo in a particular case. Considering that container cargo is within the vessel's control during the course of a voyage and that containerization has proliferated rapidly in the shipping industry,[43] it would unduly insulate the vessel from liability to hold, as the Majority does, that container cargo is exempt from the scope of a vessel's duty. That this action is one involving containerized cargo is a relevant fact which I believe should be considered by the jury just as it considers

---

**38.** *See Canizzo v. Farrell Lines, Inc.,* 579 F.2d 682 (2d Cir. 1978), *cert. denied,* — U.S. —, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978); *Napoli v. (Transpacific Carriers Corp. and Universal Cargo Carriers, Inc.) Hellenic Lines, Ltd.,* 536 F.2d 505 (2d Cir. 1976); *Darwin v. United States,* 435 F.Supp. 501 (N.D.Cal.1977); *Davis v. Inca Compania Naviera S.A.,* 440 F.Supp. 448 (W.D. Wash.1977); *Dodge v. Mitsui Shintaku Ginko, K. K.,* No. 73–852 (D.Or.1974), aff'd 528 F.2d 669 (9th Cir. 1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).

**39.** Maj. Op. at 553.

**40.** *See Gutierrez v. Waterman Steamship Corp.,* 373 U.S. 206, 213, 83 S.Ct. 1185, 1190, 10 L.Ed.2d 297 (1963) ("These cases all reveal a proper application of the seaworthiness doctrine, which is in essence that things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used.").

**41.** In *Espinoza v. United States Lines, Inc.,* 444 F.Supp. 405 (S.D.N.Y.1978), *the court entered judgment notwithstanding the verdict for the vessel in a case where the longshoreman sustained injuries from falling off a defective container. This decision was not based on the ground that a vessel owes no duty to longshoremen with respect to the condition of containers, but rather on the fact the injury "occurred during the loading of the [vessel], and there was no evidence offered to support any claim that the shipowner's agents had actual knowledge of the alleged depression or dent in the top of the container." Id. at 414.*

**42.** *E. g., Canizzo v. Farrell Lines, Inc.,* 579 F.2d 682 (2d Cir. 1978), *cert. denied,* — U.S. —, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978).

**43.** For a discussion of containerization and its effects on labor practices in the stevedoring industry, see Case Comment, 90 Harv.L.Rev. 815 (1977).

all other relevant facts in determining whether the vessel was negligent.

Despite the possibility that Rich would have made out a cause of action under §§ 343–343A, he chose to argue to the district court that these provisions were not pertinent to the vessel's liability under the negligence action provided in section 5(b).[44] On the theories of liability which Rich did present to the district court, I think that judgment was properly directed against him despite the jury's verdict.[45] Although I join in the conclusion reached by the Majority for this reason, I strongly urge that the Majority's rejection of the applicability of §§ 343–343A in section 5(b) actions be reviewed by our entire court. Not only is the correct interpretation of a significant congressional enactment at stake, but so too is the obligation of this court to provide guidance to the district courts by setting forth unequivocally the complete contours of a section 5(b) cause of action. While I recognize that this case may not be the ideal vehicle for such instruction because of the theories on which it was presented, this aspect of the case should not cause this court to be channeled into an incorrect interpretation of the statute. I have therefore expressed my views separately from the Majority, concurring only in the result.

---

44. *See* Trial Brief for Plaintiff at 33–38.

On appeal, this court will not normally consider errors not raised below, *Faudree v. Gravel Co.*, 315 F.2d 647 (3d Cir. 1963), in part so that the district court may have an opportunity to avoid error. *See* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2472 at 454–56 (1971). The policies underlying this rule are of even greater relevance when a party before the district court specifically disavows a legal theory upon which his case might have been presented.

45. Rich argued in the district court that the vessel retained control of the stevedore's activi-

ties and that it was negligent in the exercise of this control, thereby giving rise to liability under Restatement II § 414. I agree with the Majority's rejection of this argument. *See* Maj. Op. at 549–551. Rich also argued in the district court, but not on appeal, that a vessel may be held liable under the standard set forth in Restatement II § 392, concerning chattels dangerous for their intended use. I do not believe that a vessel may be properly analogized to a chattel, nor do I think that a vessel is "used" by longshoremen within the meaning of the Restatement.